CASE NO. 24-5932
_____

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT
_____

UNITED STATES OF AMERICA
Plaintiff-Appellant

v.

ERIK CHARLES MAUND, a/k/a "Erik Moore,"
BRYON BROCKWAY, and
ADAM CAREY
Defendants-Appellees

On Appeal from the United States District Court
for the Middle District of Tennessee, Nashville Division
William L. Campbell, Jr., Chief U.S. District Judge, No. 3:21-cr-00288

_____

OPENING BRIEF FOR THE UNITED STATES
_____

ROBERT E. McGUIRE
Acting United States Attorney for
the Middle District of Tennessee

RASCOE DEAN
BROOKE CAREY FARZAD
Assistant United States Attorneys
719 Church Street, Suite 3300
Nashville, Tennessee 37203
(615) 736-5151

*Attorneys for Plaintiff-Appellant*

# <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ........................................................iv

STATEMENT REGARDING ORAL ARGUMENT ........................... vii

STATEMENT OF JURISDICTION.........................................................1

STATEMENT OF THE ISSUES...........................................................2

STATEMENT OF THE CASE.............................................................4

  I.  INTRODUCTION ...............................................................4

  II.  THE DEFENDANTS AND PELED CONSPIRE TO MURDER WILLIAMS AND LANWAY ...............................................................6

    A. Maund Has an Affair with Holly Williams in Nashville ...........................6
    B. Lanway Attempts to Extort Maund, and Maund Conspires with Peled, Brockway, and Carey to Murder Williams and Lanway...........................7

  III.  BROCKWAY AND CAREY KIDNAP AND MURDER LANWAY AND WILLIAMS.11

  IV.  AFTER A LENGTHY MNPD AND FBI INVESTIGATION, A GRAND JURY CHARGES THE DEFENDANTS AND PELED WITH A MURDER-FOR-HIRE AND KIDNAPPING CONSPIRACY ...............................................................13

    A. MNPD and the FBI Uncover Significant Evidence Connecting the Defendants to Williams's and Lanway's Murders...................................13
    B. The FBI Approaches Conaway About the Murders in the Fall of 2021, and He Agrees to Act as a Confidential Human Source .................................15
    C. The Grand Jury Indicts the Defendants and Peled, and Peled Agrees to Cooperate with the United States ...........................................18
    D. The Grand Jury Returns a Superseding Indictment ................................21

  V.  JURY TRIAL ...............................................................22

i

  A. The United States Introduces Overwhelming Admissible Evidence of the Defendants' Guilt ......................................................................22

  B. The Defendants Contemplate Introducing Evidence of Each Other's Statements.............................................................................24

  C. The Jury Convicts the Defendants in a Split Verdict ..............................27

VI. THE DISTRICT COURT DISCOVERS THAT CERTAIN EXHIBITS WERE ERRONEOUSLY SUBMITTED TO THE JURY AND, AFTER HOLDING A *REMMER* HEARING, GRANTS THE DEFENDANTS' MOTIONS FOR A NEW TRIAL .........28

SUMMARY OF THE ARGUMENT ......................................................................34

ARGUMENT ........................................................................................................35

I. THE DISTRICT COURT ABUSED ITS DISCRETION IN CONCLUDING THAT THE JURY'S EXPOSURE TO CAREY EXHIBITS #3-4 WAS STRUCTURAL ERROR ...35

  A. Standard of Review................................................................................35

  B. Law........................................................................................................36

   1. *The Structural Error Doctrine*...........................................................36

   2. *Extraneous Influences and* Remmer *Hearings*.................................38

   3. Bruton *and Confrontation Clause Violations*....................................40

  C. The District Court Abused Its Discretion in Finding that the Jury's Exposure to Carey Exhibits #3-4 Amounted to Structural Error ..........41

II. THE JURY'S EXPOSURE TO CAREY EXHIBITS #3-4 IS A HARMLESS ERROR UNDER ANY STANDARD.................................................................................46

  A. Standard of Review................................................................................47

  B. Law........................................................................................................48

  C. Given the Overwhelming Admissible Evidence of the Defendants' Guilt, the Jury's Exposure to Carey Exhibits #3-4 Was Harmless Beyond a Reasonable Doubt .................................................................................49

CONCLUSION ....................................................................................................55

CERTIFICATE OF COMPLIANCE....................................................................56

CERTIFICATE OF SERVICE ..................................................................57

ADDENDUM ...........................................................................................58

# TABLE OF AUTHORITIES

Cases                                                                                    Pages(s)

*Arizona v. Fulminante*,
    499 U.S. 279 (1991) .........................................................................37
*Bomar v. Wetzel*,
    2024 WL 1485838 (E.D. Pa. Apr. 5, 2024)........................................40
*Cunningham v. Shoop*,
    23 F.4th 636 (6th Cir. 2022) ............................................................39
*Delaware v. Van Arsdall*,
    475 U.S. 673 (1986) ................................................................. 36, 48
*Eslaminia v. White*,
    136 F.3d 1234 (9th Cir. 1998).........................................................45
*Greer v. United States*,
    593 U.S. 503 (2021) .......................................................................37
*In re Sittenfeld*,
    49 F.4th 1061 (6th Cir. 2022)................................................ passim
*Mccoy v. Louisiana*,
    584 U.S. 414 (2018) .......................................................................43
*Neder v. United States*,
    527 U.S. 1 (1999) .................................................... 37, 41, 44
*Remmer v. United States*,
    347 U.S. 227 (1954) ................................................................ passim
*Richardson v. Marsh*,
    481 U.S. 200 (1987) .......................................................................40
*Rose v. Clark*,
    478 U.S. 570 (1986) .......................................................................36
*Samia v. United States*,
    599 U.S. 635 (2023) ...................................................... 40, 42, 50
*Schneble v. Florida*,
    405 U.S. 427 (1972) .......................................................................36
*Stanford v. Parker*,
    266 F.3d 442 (6th Cir. 2001)...........................................................41
*United States v. Campbell*,
    122 F.4th 624 (6th Cir. 2024)..........................................................48
*United States v. Chanthadara*,
    230 F.3d 1237 (10th Cir. 2000).......................................................39

*United States v. Dutkel*,
    192 F.3d 893 (9th Cir. 1999) ........................................................ 40, 45
*United States v. Gonzalez-Lopez*,
    548 U.S. 140 (2006) ..................................................................... 42, 43
*United States v. Hastings*,
    461 U.S. 499 (1983) ............................................................................46
*United States v. Hendrickson*,
    822 F.3d 812 (6th Cir. 2012) ..............................................................47
*United States v. Kechego*,
    91 F.4th 845 (6th Cir. 2024) ...............................................................39
*United States v. Lanier*,
    988 F.3d 284 (6th Cir. 2021) .................................................... passim
*United States v. Lundy*,
    83 F.4th 615 (6th Cir. 2023) ...............................................................41
*United States v. Macias*,
    387 F.3d 509 (6th Cir. 2004) ....................................................... 35, 51
*United States v. Mallory*,
    902 F.3d 584 (6th Cir. 2018) ..............................................................46
*United States v. McGee*,
    529 F.3d 691 (6th Cir. 2008) ..............................................................47
*United States v. Mix*,
    791 F.3d 603 (5th Cir. 2015) ..............................................................35
*United States v. Munoz*,
    605 F.3d 359 (6th Cir. 2010) ..............................................................36
*United States v. Noushfar*,
    78 F.3d 1442 (9th Cir. 1996) ....................................................... 44, 45
*United States v. Olano*,
    507 U.S. 725 (1993) ..................................................................... 40, 41
*United States v. Pelullo*,
    14 F.3d 881 (3d Cir. 1994) .................................................................55
*United States v. Perry*,
    438 F.3d 642 (6th Cir. 2006) ..............................................................38
*United States v. Quiles*,
    618 F.3d 383 (3d Cir. 2010) ...............................................................49
*United States v. Robinson*,
    99 F.4th 344 (6th Cir. 2024) ...............................................................35
*United States v. Rogers*,
    580 F. App'x 347 (6th Cir. 2014) ................................................. 49, 54

v

*United States v. Saada*,
   212 F.3d 210 (3d Cir. 2000) ...............................................................53
*United States v. Sababu*,
   891 F.2d 1308 (7th Cir. 1989) ...........................................................39
*United States v. Smith*,
   354 F.3d 390 (5th Cir. 2003) ..............................................................38
*United States v. Tejada*,
   481 F.3d 44 (1st Cir. 2007) ................................................................39
*United States v. Treadwell*,
   760 F.2d 327 (D.C. Cir. 1985)............................................................49
*United States v. Warner*,
   498 F.3d 666 (7th Cir. 2007) ..............................................................39
*United States v. Willis*,
   257 F.3d 636 (6th Cir. 2001) ..............................................................36
*United States v. Winston*,
   55 F. App'x 289 (6th Cir. 2003)..................................... 49, 50, 51, 52
*Weaver v. Massachusetts*,
   582 U.S. 286 (2017) ...................................................... 37, 42, 44

Statutes

18 U.S.C. § 924(c) & (j)......................................................................18
18 U.S.C. § 1958..................................................................................21
18 U.S.C. § 3231 ...................................................................................1
18 U.S.C. § 3731 ...................................................................................1
18 U.S.C. §§ 1201(a) & (c)........................................................... 18, 21
18 U.S.C. §§ 1201(a)(1) and 2 ...........................................................21

Rules

Fed. R. Evid. 606 ................................................................................30
Federal Rule of Criminal Procedure 33 ........................................ 35, 36

Other

3 *Federal Practice and Procedure: Criminal* § 587 (5th ed. June 2024)
   Charles Alan Wright, Arthur R. Miller, & Sarah N. Welling........................ 35, 38

## **STATEMENT REGARDING ORAL ARGUMENT**

The United States, as plaintiff-appellant, respectfully requests oral argument and submits that oral argument will assist the Court in deciding this case.

## <u>STATEMENT OF JURISDICTION</u>

The district court exercised jurisdiction under 18 U.S.C. § 3231, which provides jurisdiction over all federal crimes. On November 17, 2023, the jury returned a split verdict convicting Defendants Brockway and Carey of the three counts charged against them and Defendant Maund of Count One. (Redacted Jury Verdict Forms, R. 437, 439, 441). On September 17, 2024, the district court issued a memorandum opinion granting the defendants' motions for a new trial on their counts of conviction. (Mem. Op. Granting New Trial, R. 561, #6388).[1] The United States filed a timely notice of appeal on October 15, 2024. (Notice of Appeal, R. 565, #6425). This Court has jurisdiction under 18 U.S.C. § 3731.

---

[1] This brief cites documents from Case No. 3:21-cr-00288 using the form "[Document Description], R. __, # [Page I.D. #:]."

## <u>STATEMENT OF THE ISSUES</u>

A federal grand jury charged Erik Maund, Bryon Brockway, and Adam Carey in a murder-for-hire plot that resulted in the violent deaths of two victims. At trial, the United States introduced substantial admissible evidence of the defendants' guilt through witness testimony, the defendants' own incriminating statements, and other corroborating evidence. The jury ultimately returned a split verdict, convicting all three defendants of conspiracy to commit murder-for-hire.

However, several months after the jury's verdict, the court discovered that the jury had inadvertently been exposed to several unadmitted exhibits—specifically, Carey Exhibits #3-4—that contained a single statement from Brockway purportedly exculpating Carey. After holding a *Remmer* hearing, the district court granted the defendants' motions for a new trial, finding that the jury's exposure to Carey Exhibits #3-4 fell within the "very limited class of" errors that require automatic vacatur of a defendant's conviction. The United States' appeal raises the following issues:

> I.   Under this Court's binding precedent, the "mere occurrence of . . . extraneous information" in the jury room "is not, without evidence of actual prejudice, enough to warrant a new trial." *In re Sittenfeld*, 49 F.4th 1061, 1067 (6th Cir. 2022). Did the district court abuse its discretion in concluding that the jury's exposure to Carey Exhibits

2

#3-4 amounted to a structural error that is not amenable to harmless error analysis?

II.   Was the jury's inadvertent exposure to Carey Exhibits #3-4 harmless beyond a reasonable doubt where (a) the United States presented overwhelming admissible evidence of each defendant's guilt; and (b) Carey Exhibits #3-4 neither inculpated the defendants nor precluded the jury from considering exculpatory evidence?

## STATEMENT OF THE CASE

### I.    INTRODUCTION

Erik Maund "had a problem." (Trial Statement, R. 457, #2981). Maund, a married father of two who worked as a partner at a family-owned auto dealership in Austin, Texas, had recently had an extramarital affair with a "high-end escort" named Holly Williams in Nashville. (*Id.* at #2981-82). And by early March 2020, Maund learned that Williams's "on-again off-again boyfriend," William Lanway, was threatening to disclose the affair to Maund's family, unless Maund paid him $25,000. (*Id.*). Maund responded to Lanway's extortionate demand by hiring Gilad Peled, Bryon Brockway, and Adam Carey to arrange and (in the case of Brockway and Carey) to carry out the murder of Williams and Lanway in Nashville late on the evening of March 12, 2020. (Trial Transcript, R. 458, #3355, 3356-57; Trial Transcript, R. 459, #3593).

After a lengthy investigation by the Federal Bureau of Investigation ("FBI") and the Metropolitan Nashville Police Department ("MNPD"), a federal grand jury charged Maund, Peled, Brockway, and Carey with conspiracy to commit murder for hire, conspiracy to commit kidnapping resulting in death, and with kidnapping resulting in death. (Superseding Indictment, R. 127, #518-26). Peled pled guilty and cooperated with the United States (Criminal Minutes, R. 210, #1163), while Maund,

Brockway, and Carey (collectively "the defendants") proceeded to trial. (Criminal Minutes, R. 393, #2275).

After an eleven-day trial during which the United States presented overwhelming evidence of each defendant's guilt, the jury convicted the defendants of engaging in a murder-for-hire conspiracy that caused the deaths of Williams and Lanway, and it convicted Brockway and Carey of conspiracy to commit kidnapping and kidnapping. (Maund Redacted Verdict Form, R. 437, #2687; Brockway Redacted Verdict Form, R. 439, #2693; Carey Redacted Verdict Form, R. 441, #2699).

Approximately two months later, the district court discovered that it had inadvertently delivered several *unadmitted* exhibits to the jury room at the conclusion of the trial. (Mem. Op. Granting New Trial, R. 561, #6391). The defendants filed motions for a new trial, and the court held a *Remmer*[2] hearing on the matter in which almost all of the jurors testified that they had no memory of the erroneously admitted exhibits. (*Id.* at #6407-08). Despite this Court's binding precedent requiring the district court to assess whether its error affected the jury's verdict, the court vacated the defendants' convictions and ordered a new trial, finding that its erroneous submission of two particular exhibits amounted to

---

[2] *Remmer v. United States*, 347 U.S. 227 (1954).

structural error. (*Id.* at #6388). The United States now challenges the district court's order granting the defendants a new trial.

## II.    THE DEFENDANTS AND PELED CONSPIRE TO MURDER WILLIAMS AND LANWAY.

### A. Maund Has an Affair with Holly Williams in Nashville.

In February 2020, Maund traveled to Nashville to visit his son, who was a student a Nashville university. (Trial Transcript, R. 457, #3110-13; Trial Transcript, R. 458, #3326). Prior to his trip, Maund contacted Holly Williams, who held herself out to clients as "Layla Love" on Slixa,[3] via email and arranged to meet her at the J.W. Marriott hotel in downtown Nashville. (Trial Transcript, R. 457, #3109-12). Maund and Williams also exchanged text messages via an app called Pinger (*id.* at #3122-25), and they had sex. (*Id.* at #3145; Trial Transcript, R. 458, #3326).

Unbeknownst to Maund, Williams was in a relationship with William Lanway. (Trial Transcript, R. 457, #3108). Williams's and Lanway's relationship was "toxic," as evidenced by Williams's previous calls to MNPD to report their domestic disputes. (*Id.* at #3107-08). Lanway hacked into Williams's "accounts" and took screenshots of her communications with third parties, including Maund. (*Id.* at #3125-26).

---

[3] Slixa "is an online advertisement for escorts." (Trial Transcript, R. 457, #3108).

### B. Lanway Attempts to Extort Maund, and Maund Conspires with Peled, Brockway, and Carey to Murder Williams and Lanway.

In early March 2020, Maund told James DiMeo, the managing partner at Charles Maund Toyota in Austin, that someone was attempting to extort him based on his liaison with Williams. (Trial Transcript, R. 458, #3283, 3285-87). DiMeo contacted Peled—a former Israeli tank commander with a private security background—to assist Maund in resolving the matter. (*Id.* at #3300, 3322-23). Peled, who provided "security consulting for the Maund dealership" through his business, Speartip Security Group, and had known Maund since 2019, met Maund at the dealership and listened as Maund explained that someone in Nashville was extorting him, demanding $25,000 in cash in exchange for silence about Maund's affair with Williams. (*Id.* at #3325-27, 3518).

Maund, who feared that alerting law enforcement to the extortion would reveal the affair to his family, hired Peled to deal with his problem. (*Id.* at #3327-28). After confirming Holly Williams's identity, Peled sent a team to Nashville to surveil and obtain information about Williams and the person extorting Maund. (*Id.* at #3334-35). Peled hired Brockway, a former Marine who still did contract work for the government, to assist with the "project." (*Id.* at #3335; Trial Transcript, R. 460, #3971-72). Brockway, in turn, hired Carey, David Conaway, and Anthony Repinski—all former members of the military—to travel to Nashville to handle the

surveillance.[4] (Trial Transcript, R. 458, #3337-38; Trial Transcript, R. 460, #3973-75; Trial Transcript, R. 461, #4217-18).

In Nashville, Carey, Conaway, and Repinski surveilled Williams's residence "to see if there was a viable point to try and have a conversation to ascertain who was actually extorting [] Maund." (Trial Transcript, R. 460, #3984). The three men also unsuccessfully attempted to contact Williams and Lanway over email and in person, including by knocking on Williams's apartment door—an act that was recorded by Williams's surveillance system. (*Id.* at #3990-94). The three men even approached Lanway and attempted to engage him in a Kroger parking lot, but Lanway refused to speak with them. (*Id.* at #4008-09).

While in Nashville, Conaway and Repinski became concerned by Carey's behavior. (*Id.* at #4003; Trial Transcript, R. 461, #4223-24). Specifically, Carey's "insinuation that he would . . . murder" Williams or Lanway for $50,000 or $60,000, and his proposal to assault Lanway by zip tying him to the steering wheel of his vehicle, led Conaway and Repinski to believe that Carey "was a little bit of a loose cannon." (Trial Transcript, R. 460, #4003, 4010-12; Trial Transcript, R. 461, #4223).

---

[4] Carey was a former active-duty United States Marine, who had served in the Marine Forces Special Operations Command while in the military. (Superseding Indictment, R. 127, #516). Conaway was a former Army Ranger (Trial Transcript, R. 460, #3964), and Repinski had served in the United States Navy as a member of Seal Team Six. (Trial Transcript, R. 461, #4216-17).

Carey also carried a .22 pistol with him to Nashville. (Trial Transcript, R. 460, #4012).

On March 9, 2020, Brockway sent Peled a situation report that Peled, in turn, shared with Maund documenting the team's unsuccessful efforts to contact Williams and Lanway. (Trial Transcript, R. 458, #3340; Trial Transcript, R. 460, #3995; United States Exhibit 236). The report assessed Lanway's threats to reveal Maund's affair with Williams "to be relatively empty," given "the lack of follow-up." (Trial Transcript, R. 458, #3342).

However, on March 11, Maund informed Peled that Lanway had called his home phone and again threatened to contact Maund's wife about the affair. (*Id.* at #3346). According to Peled, Maund was "freak[ed] out" by Lanway's decision to call his home, and he demanded that Peled's operation produce "results." (*Id.*). Peled, for his part, contacted Brockway, who was supervising the Nashville operation from Austin, and informed him of Lanway's renewed threat. (*Id.* at #3347).

At this point, the dynamics of the operation changed. Brockway told Peled that the team should "take [Lanway] out," and he explained that Lanway's murder would cost a total of $120,000—$60,000 per shooter. (*Id.* at #3348-49). Brockway traveled to Nashville on March 11 (*id.* at #3347), and Conaway and Repinski left Nashville—on March 11 and March 12, respectively—due to other professional

obligations. (Trial Transcript, R. 460, #3978; Trial Transcript, R. 461, #4223). Peled agreed to submit Brockway's proposal to Maund. (Trial Transcript, R. 458, #3348).

Peled met with Maund outside Maund's home late on the night of March 11. (*Id.* at #3351). Maund "jumped on" Brockway's offer to murder Lanway and offered to pay Peled $500,000 to arrange the murder.[5] (*Id.* at #3353-55). After leaving Maund's house, Peled contacted Brockway and confirmed that Maund wanted Lanway murdered. (*Id.* at #3357). At this point, Brockway explained that he and Carey should also murder Williams, given their belief that she too was involved in the plot to extort Maund. (*Id.*). Brockway proposed to Peled that Maund pay him and Carey $100,000 apiece for the murders of Williams and Lanway, and the following day Maund agreed to pay Peled a total of $750,000 for the murders. (*Id.* at #3357-58).

Maund, who had previously paid Peled $65,000 in cash for his services, wired $150,000 to Peled's Speartip Security Group account on the afternoon of March 12. (*Id.* at #3359-61; United States Trial Exhibit 228). Peled then contacted Brockway and confirmed that Maund had transferred a portion of the payment for Williams's and Lanway's murders. (*Id.* at #3361).

---

[5] As Peled admitted at trial, Maund's $500,000 offer represented a substantial windfall for him, given that Brockway and Carey had already agreed to murder Lanway for just $120,000. (*Id.* at #3355).

10

### III. Brockway and Carey Kidnap and Murder Lanway and Williams.

"Close to midnight" on March 12, 2020, the surveillance system at Williams's apartment showed Williams and Lanway leaving her apartment and walking to the parking lot. (Trial Transcript, R. 457, #3174). The surveillance system then captured the sound of "[g]unshots, banging[,] and screaming" in the parking lot. (*Id.*). As they explained in subsequent admissions, Brockway and Carey ambushed Williams and Lanway as they got into Williams's 2005 Acura. (*See, e.g.*, United States Exhibit #131). Brockway "took" Lanway and murdered him as he entered the Acura's driver's seat. (*Id.*; Trial Transcript, R. 460, #4072). However, in doing so, Brockway injured his hand when he "caught" it in the car's driver's door, which sustained significant damage. (United States Trial Exhibit #131). Carey shot and wounded Williams, and after forcing Williams into the backseat, Brockway "jumped in the" Acura and "took off," following Carey, who was driving a black 2020 Nissan Altima sedan that Brockway had rented upon arriving in Nashville. (*Id.*; Trial Transcript, R. 459, #3591-92). Brockway and Carey drove Lanway's body and Williams to the "dump site" at 497 Old Hickory Boulevard in Nashville. (United States Trial Exhibit #131).

After arriving at the dump site, Carey climbed into the Acura's backseat and murdered Williams in cold blood. (*Id.*) As Brockway later explained, Williams "wound up still breathing" at the dump site, so Carey

> went back there and [said], you know, 'it's okay. We're not here for
> you. We're here for him,' whatever, blah, blah, blah, blah.

(*Id.*) Carey then murdered Williams by shooting her in the head. (*Id.*; Trial Transcript, R. 463, #4561). Carey's behavior earned Brockway's "respect" because "unlike [a] lot of guys with females," Carey did not show "a bleeding heart" in executing Williams. (United States' Trial Exhibit #131).

Before leaving the scene, Brockway and Carey pushed the Acura into a nearby ditch. (*Id.*; Trial Transcript, R. 457, #3025-26). Brockway then returned his rental car to the Hertz location at the Nashville International Airport; drove to Memphis with Carey; and flew from Memphis to Austin early on the morning of March 13. (Trial Transcript, R. 459, #3587-90; Trial Transcript, R. 460, #4016-17). After dropping Brockway off in Memphis, Carey drove his Dodge Ram pickup truck from Nashville to Austin. (Trial Transcript, R. 459, #3601-04). Upon arriving in Austin, Brockway and Carey met separately with Peled, who paid each man $100,000 in cash for committing the murders. (Trial Transcript, R. 458, #3364). Maund, for his part, made additional wire transfers to Peled in the months after the murders. (*Id.* at #3362-63; Trial Transcript, R. 459, #3614). In the days after Williams's and Lanway's murders, the defendants and Peled got "rid" of their cellphones. (Trial Transcript, R. 458, #3362; Trial Transcript, R. 459, #3596-3600).

IV.    **AFTER A LENGTHY MNPD AND FBI INVESTIGATION, A GRAND JURY CHARGES THE DEFENDANTS AND PELED WITH A MURDER-FOR-HIRE AND KIDNAPPING CONSPIRACY.**

### A. MNPD and the FBI Uncover Significant Evidence Connecting the Defendants to Williams's and Lanway's Murders.

After the discovery of Williams's and Lanway's bodies, the MNPD and (later) the FBI began investigating the murders. (Trial Transcript, R. 457, #3104; Trial Transcript, R. 459, #3558). The investigation quickly developed significant evidence connecting the defendants and Peled to the murders. For instance, MNPD Detective David Willover obtained a search warrant for the email account connected with Williams's professional name—Layla Love—and reviewed messages between "Erik Moore" and Williams regarding her and Maund's February 2020 meeting at the J.W. Marriott in Nashville. (Trial Transcript, R. 457, #3108-23). MNPD also obtained and reviewed surveillance footage from Williams's apartment and determined that (a) Carey—who had used a Pinger number that was terminated in the early morning hours of March 13, 2020, to contact Williams and Lanway—had knocked on Williams's door two days before her murder; and (b) Williams and Lanway were first assaulted and kidnapped in the apartment's parking lot. (*Id.* at #3155-58, 3164-66, 3174-75).

The FBI developed additional corroborating evidence through "federal search warrants and subpoenas for phone and business records." (Trial Transcript, R. 459, #3558). Agents learned (among other things) that Maund had, in fact, traveled to

13

Nashville and stayed at the J.W. Marriott hotel in February 2020; that Brockway's and Carey's bank records showed they were in Nashville together on March 11, 2020; that Lanway had texted Maund in early March 2020 and called him multiple times on March 11; that Peled had called a number associated with Lanway on March 2; that Brockway had flown to Nashville on March 11 and checked out of the same Nashville hotel on the morning of March 12 where Conaway and Repinski had stayed; and that Brockway had returned to Texas on an 8:30 a.m. flight from Memphis on the morning of March 13.  (*Id.* at #3559-60, 3570-72, 3584, 3585-87, 3606-08, 3610; United States Trial Exhibit #116).

The FBI further discovered that Brockway had rented a four-door black 2020 Nissan Altima sedan with chrome trim that matched the vehicle captured driving towards the dump site with Williams's vehicle in the minutes after Lanway had been murdered and Williams had been assaulted and kidnapped. (*Id.* at #3590-94). Brockway returned the sedan to the Nashville International Airport in the early morning hours of March 13. (*Id.* at #3590). And importantly, the FBI determined that Maund had wired $150,000 to Peled's business account on the afternoon of March 12—only hours before the murders—and that by March 16, Peled had started to withdraw large sums of money (approximately $140,000) from his account over a two-week period. (*Id.* at #3611, 3613-14).

14

### B. The FBI Approaches Conaway About the Murders in the Fall of 2021, and He Agrees to Act as a Confidential Human Source.

On the basis of this and other evidence, in the fall of 2021 the FBI decided to approach David Conaway about Williams's and Lanway's murders. (*Id.* at #3652). The FBI took this "risk" in part because it knew that Conaway had been present with Carey in Nashville, but that he had left Tennessee two days before the murders occurred. (*Id.* at #3649-52). The FBI "use[d] a ruse" to approach Conaway (*id.* at #3652), arranging to speak with him at the Defense Intelligence Agency in a meeting that, Conaway believed, was supposed to be "about some follow-up on [his] security clearance." (Trial Transcript, R. 460, #4023). Conaway eventually admitted to the FBI that he had been in Nashville surveilling Williams and Lanway with Carey and Repinski in March 2020, and that Brockway had led the surveillance team. (*Id.* at #4025). Conaway maintained that he was not involved in the conspiracy to murder Williams and Lanway, but he told the FBI that Carey had conveyed to him in a March 2020 phone call that he and Brockway had, in fact, murdered Williams and Lanway.[6] (*Id.* at #4018-19).

Conaway agreed to work with the FBI as a confidential human source ("CHS"), and in September, October, and November, 2021, he made recorded phone

---

[6] Conaway confirmed Carey's claim by searching the internet for information about the murders. (*Id.* at #4020). Conaway also learned that police had obtained surveillance images of him and Carey outside Williams's apartment door and were seeking information from the public about the murders. (*Id.*)

calls to Brockway and Carey and wore a recording device during face-to-face meetings with both men. (Trial Transcript, R. 459, #3654-55, 3658). Because Conaway had not spoken to Brockway or Carey in 18 months, and because the FBI believed that the men would be suspicious about Conaway's outreach, the FBI directed Conaway to "use a ruse" and tell Brockway and Carey that he was contacting them about another murder-for-hire job that "was similar to the one in Nashville." (*Id.* at #3665; *see* Trial Transcript, R. 460, #4035).

In subsequent recorded conversations with Conaway, both Brockway and Carey agreed to join the fictional murder-for-hire scheme proposed by Conaway (Trial Transcript, R. 459, #3665), and they made several incriminating statements about Williams's and Lanway's murders. (*Id.* at #3665-66). For instance, during an October 25, 2021, recorded in-person meeting with Conaway, Brockway explained how he and Carey had kidnapped and murdered Williams and Lanway, relating that: (i) he did not know they would be murdering two people until the last minute; (ii) the kidnappings and murders "were f**king tough" in part because Williams's car door frame was bent when he smashed his hand in the door during her abduction and Lanway's murder; (iii) he and Carey "had to f**king take them at the same time"; and that (iv) Carey "finished" Williams, who was still breathing, by shooting her in the backseat at the dump site. (United States Trial Exhibit #131; Trial Transcript, R.

460, #4072-73). Brockway praised Carey for his cold-blooded murder of Williams during the following exchange with Conaway:

> Brockway: She wound up still breathing. (Audio Break). He was like, got it, all right? No problem. F\*\*king went back there and, you know, 'it's okay. We're not here for you. We're here for him,' whatever, blah, blah, blah, blah.
>
>     . . .
>
> Brockway: And he finished it in the back seat.
>
> Conaway: Nice.
>
> Brockway: And he got my, he totally got my respect for that, dude.
>
> Conaway: Yeah.
>
> Brockway: A lot of guys with females, they f\*\*king have a bleeding heart.

(United States' Trial Exhibit #131).

Brockway went on to give Conaway advice regarding how to perpetrate the fictional murder-for-hire scheme. (*Id.*) In doing so, Brockway explained that dumping the bodies at a different location from where the murders occurred made sense based on his mistaken belief that (as in the case of Williams's and Lanway's murders), "if you're mobile, they're never going to figure out where the original X was." (*Id.*) Finally, Brockway explained that he and Carey took Williams and Lanway to the dump site "after we got everything closed, rolled down, [and] cleaned up so we're not looking like f\*\*king gangsters or anything." (*Id.*)

Carey, for his part, told Conaway that he could support his fictional murder-for-hire scheme by, among other things, helping him dispose of the firearms used to commit the murder, which, Carey claimed, he could turn to pixie dust. (United States' Trial Exhibit #125). Carey also recommended that Brockway participate in Conaway's murder scheme in part because he had previously "done it" with Brockway. (*Id.*)

### C. The Grand Jury Indicts the Defendants and Peled, and Peled Agrees to Cooperate with the United States.

On the basis of this and other evidence, a federal grand jury sitting in Nashville returned a three-count Indictment on November 29, 2021, charging the defendants and Peled with conspiracy to commit kidnapping and substantive kidnapping with death resulting, in violation of 18 U.S.C. §§ 1201(a) and (c), and with discharging a firearm during and in relation to crime of violence, in violation of 18 U.S.C. § 924(c) & (j). (Indictment, R. 3, #58). A magistrate judge ordered that the indictment remain sealed pending the defendants' and Peled's arrest. (Order to Seal, R. 2, #3).

The defendants and Peled were arrested on December 10, 2021, and Peled was arrested *before* Maund. (Trial Transcript, R. 459, #3637). FBI agents arrested Peled, who was traveling back to Texas from a convention in Las Vegas, as he deplaned in Austin. (Trial Transcript, R. 458, #3375). Agents took Peled to an interview room inside the Austin airport, where Peled agreed to answer the FBI's questions. (*Id.* at

18

#3376). During the interview, Peled admitted to his involvement in the murder-for-hire scheme, and he agreed to make a recorded phone call to Maund. (*Id.* at #3368).

In order to "create a scenario in which [] Maund was comfortable" discussing his involvement in the murder-for-hire plot, the FBI directed Peled to use the following "ruse" in his conversation with Maund: that "one of the shooters from Nashville found out that [Maund] w[as] the client that paid for [the murders] and wanted more money." (Trial Transcript, R. 459, #3640-42). During the ensuing call, Peled told Maund that they had "a problem with one of the shooters in Nashville." (United States Trial Exhibit #120). Peled went on to explain that the unnamed shooter—Carey—was "hurting for money" and had demanded $25,000 more as payment for the murders. (*Id.*) Maund responded to this ruse by making remarkable admissions about Williams's and Lanway's murders, and by arranging to have Peled and Brockway murder Carey in exchange for another $150,000 payment. (*Id.*) Specifically, Maund and Peled engaged in the following colloquy:

> Maund: Yeah, but if I give 25, when's it going to stop?

> Peled: I know. I know. But I mean, what – what do you want to do?

> Maund: I'll pay the guy 25,000, but I think it needs to go away after that.

> Peled: So we need to take care of him?

> Maund: Well, I mean, don't you think he's not going to f**king stop?

19

Peled: I don't know. It's not – it's not like that -- that guy that, you know, extorted you initially. That was a criminal.

Maund: Yeah.

Peled: And this guy -- this guy is -- you know, he's not threatening your family. I know you wanted to get this thing taken care of initially because he was threatening your family . . . This guy is just a soldier that I guess needs money. I don't think he's going to come back.

Maund: Look, if you tell me he's not going to come back, I'll get the f**king money put together. I don't care about that. He did a solid for me, and I appreciate him for that, but I just want to make sure it's -- you know, in six months down the road he's not going to pop back up.

Peled: Okay. Let me talk to him. I'll try to prevent that. Hopefully, you know, I'll talk to Bryon [Brockway]. Maybe he can talk to him and get this gone completely where you don't have to pay the 25-, but worst-case scenario, if that –

Maund: Well, like I said, the 25- is not a big deal.

Peled: Right.

Maund: I don't care about that. I don't give a sh*t about that.

Peled: Right.

Maund: But I just don't want, you know, in three or four months to get the same call again.

(United States Trial Exhibit #120).

Peled then asked Maund whether he wanted Brockway to take care of the unnamed shooter if "this thing" turned into a problem. (*Id.*; *see* Trial Transcript, R. 458, #3371-3373). Maund responded by offering to pay Peled $150,000 to "take care of [the problem] permanently"—a solution that, in Maund's view, was preferable to

paying Carey $25,000. (United States Trial Exhibit #120). Maund told Peled that he would "just run [the] 150 – through Speartip like we did last time." (*Id.*)

### D.  The Grand Jury Returns a Superseding Indictment.

In July 2022, the grand jury returned a Superseding Indictment charging the defendants with conspiracy to commit murder-for-hire resulting in death, in violation of 18 U.S.C. § 1958 (Count One); conspiracy to commit kidnapping resulting in death, in violation of 18 U.S.C. §§ 1201(a) and (c) (Count Two); and with kidnapping resulting in death, in violation of 18 U.S.C. §§ 1201(a)(1) and 2 (Count Three). (Superseding Indictment, R. 127, #516). Peled entered into a cooperation agreement with the United States and pleaded guilty (Sealed Order Accepting Plea Petition and Agreement, R. 211), and the defendants proceeded towards trial.

Prior to trial, the defendants moved to sever their cases, arguing that severance was warranted due to the specter of *Bruton* violations, the possibility of mutually antagonistic defenses, and risk of juror confusion. (Mem. Op. Denying Motion, R. 176, #804; Mem. Op. Denying Motion, R. 279, #1405). The district court denied the defendants' motions, finding (among other things) that the United States' proof at trial would comply with *Bruton*, and that the defendants could not show compelling, specific, and actual prejudice from their joinder. (Mem. Op., R. 176, #807; Mem. Op., R. 279, #1409-10).

**V.    JURY TRIAL**

**A. The United States Introduces Overwhelming Admissible Evidence of the Defendants' Guilt.**

The defendants proceeded to trial jointly on November 1, 2023. (Criminal Minutes, R. 393, #2275). At trial, the United States presented overwhelming evidence of the defendants' involvement in the murder-for-hire and (in the case of Brockway and Carey) the kidnapping conspiracies. The trial record contained the following proof implicating the defendants in Lanway's murder and Williams's kidnapping and murder:

i.    *Cooperator Testimony*. Peled's testimony directly implicated Maund, Brockway, and Carey in the murder-for-hire scheme. (Trial Transcript, R. 458, #3349-60). Peled described in detail how the murder-for-hire plot originated and how Maund ultimately authorized Brockway's plan to murder Lanway and Williams in exchange for cash. (*Id.* at #3367). Peled's testimony was corroborated by his references to bank records, emails, and other documents. (*Id.* at #3332-33, 3344-45, 3360).

ii.    *The Defendants' Recorded Statements*. The jury heard Brockway explain how he murdered Williams and Lanway during a recorded conversation with Conaway. (United States Trial Exhibit #131). Brockway recounted Lanway's murder and Williams's kidnapping and murder in vivid and chilling detail, explaining that the other shooter had earned his respect for executing Williams in the backseat of her vehicle. (*Id.*) As for Carey, he offered to join Conaway's fictional murder-for-hire scheme, and made admissions about his involvement in Williams's and Lanway's murders—including that he missed a surveillance camera outside Williams's apartment. (United States Trial Exhibit #125). Finally, the jury heard a recorded call in which Maund agreed to pay Peled and Brockway a total of $150,000 through Speartip Security "*like we did last time*" to resolve Carey's purported request for additional payment for the murders. (United States Trial Exhibit #120 (emphasis added)). In doing so, Maund admitted that the Nashville

shooters had done "a solid" for him, and that Carey's demand for payment was different from Lanway's criminal effort to extort him. (*Id.*) The jury also heard Maund's admission that he had met Williams in Nashville in early 2020. (Trial Transcript, R. 459, #3647; United States Exhibit #140).

iii.  *Witness Testimony*. Jim Dimeo, the former managing partner at Maund Toyota, testified that he connected Maund with Peled after Maund told him in early March 2020 that someone in Nashville was attempting to extort him due to his liaison with Williams. (Trial Transcript, R. 458, #3285-86). Conaway told the jury that Carey admitted to murdering Williams and Lanway in exchange for a $60,000 payment. (Trial Transcript, R. 461, #4003). Both Conaway and Repinski testified that Brockway asked them to go to Nashville to surveil Williams and Lanway, and that they worked with Carey to do so. (Trial Transcript, R. 460, #3972-74, 3980; Trial Transcript, R. 461, #4217-18, 4220-21).

Further, as previously noted, *supra* **Section IV.A**, these admissions and witnesses were corroborated by a mountain of physical evidence. For instance, the jury reviewed communications between Maund and Williams and other related records relevant to their February 2020 liaison at the J.W. Marriott in Nashville (Trial Transcript, R. 457, #3108-23); it watched surveillance footage showing Carey knocking on Williams's door only two days before the murders and moving the surveillance camera on the morning of the murders (*id.* at #3164-66; 3172-73); it reviewed bank records showing that Maund had wired Peled's business account $150,000 on the afternoon of the murders, and that by March 16, Peled had started to withdraw large sums of cash (approximately $140,000) from his account over a two-week period (Trial Transcript, R. 459, #3611, 3613-14); and it reviewed bank, hotel, and rental car records showing that Brockway and Carey were in Nashville on

23

March 12 before leaving the city and traveling to Texas in unorthodox ways shortly after the murders occurred (*id.* at #3570-72, 3584, 3585-87, 3590-94, 3606-08, 3610).

The jury also saw evidence of cellphone location data that placed Carey around the dump site on the day of the murders, and that corroborated Peled's testimony that he and Maund had met in Austin on the night of March 11. (Trial Transcript, R. 463, #4474, 4529; United States Exhibit #117). And the jury learned that Carey collected the same type of ammunition that was used to murder Williams and Lanway. (Trial Transcript, R. 457, #3048; Trial Transcript, R. 459, #3622-23). Finally, the jury watched gas station surveillance footage showing two vehicles matching the description of Brockway's rental car and Williams's Acura driving on the route from Williams's apartment to the dump site in the minutes after Lanway was murdered and Williams was assaulted and kidnapped outside of her apartment. (Trial Transcript, R. 457, #3187; United States' Exhibit #83).

### B. The Defendants Contemplate Introducing Evidence of Each Other's Statements.

The defendants attempted to counter this evidence largely by attacking Peled and (at times) one another. (*See, e.g.*, Trial Statement, R. 454, #2806-06; 2848, 2857, 2875; Trial Statement, R. 457, #2994, 3005, 3013). For instance, Carey's counsel claimed that Brockway murdered Williams and Lanway, and that Carey was merely a bystander (Trial Statement, R. 457, #3013), while Brockway's counsel

described Carey as "a loose cannon." (*Id.* at #3005). Maund, meanwhile, attacked Peled's credibility. (*Id.* at #2994, 2997; Trial Transcript, R. 458, #3340-41).

Particularly relevant to this appeal is the defendants' dispute over the admissibility of a statement Peled claimed Carey made during a July 2020 meeting in Austin between Peled, Carey, and Brockway (Trial Transcript, R. 457, #2969), and a statement Brockway made to Conaway during their October 25, 2021, recorded conversation. (Trial Transcript, R. 461, #4110-14). Peled was prepared to testify that during a July 2020 meeting at an Austin restaurant, Carey predicted to him and Brockway that they would never hear of any investigation into Williams's and Lanway's murders because "no one cares about those two people." (*See* Mem. Op. Granting New Trial, R. 561, #6397). And in the October 25, 2021, recorded conversation, Brockway had told Conaway that "Adam didn't know any of this sh*t," in reference to Carey's purported lack of knowledge about the value of being "mobile" during the murder-for-hire operation. (*Id.*; Trial Transcript, R. 461, #4110-14).

Maund and Brockway wanted to elicit testimony from Peled about Carey's incriminating statement because (in Maund's case) it purportedly "demonstrate[d] the separation between [Maund] and the [other conspirators]" (Trial Transcript, R. 458, #3264-74), and because (in Brockway's case) it rebutted Carey's defense that he was merely "a hapless rube" in the murder-for-hire scheme. (*Id.*; *see* Trial

Transcript, R. 461, #4111). And Carey wanted to introduce evidence of Brockway's recorded statement to Conaway because, Carey's counsel believed, the statement suggested Carey's innocence and supported his theory that Carey was merely present when Brockway murdered Williams and Lanway.[7] (*See, e.g.*, Trial Statement, R. 457, #3013-14).

Prior to Peled's testimony on the third day of trial, the district court directed Maund and Brockway to "steer clear" of Carey's incriminating statement "for now," but it allowed Peled to be cross-examined about the fact of the meeting and it agreed to revisit the matter if Carey's counsel presented evidence that he was not involved in the murders. (Trial Transcript. R. 458, #3272-74). On the sixth day of trial, the issue of the admissibility of Carey's incriminating statement arose again when it became clear that Carey's counsel intended on introducing evidence of Brockway's statement that "Adam didn't know any of this sh*t" during his cross-examination of Conaway. (Trial Transcript, R. 461, #4109-10). While Brockway's counsel *had no objection* to the statement being admitted, he argued that once Brockway's statement was admitted as evidence,

---

[7] The United States did not use either statement in its case-in-chief. The Assistant United States Attorney prosecuting the case explained to the court that the government would not elicit testimony from Peled about Carey's July 2020 statement in part because Peled had only disclosed the statement to the government approximately one week before the trial. (Trial Transcript, R. 457, #2969-72). The government in an abundance of caution did not introduce Brockway's statement explicitly referencing Carey in its case-in-chief to assuage any *Bruton* concerns.

> It's our position that [Carey has] opened the door as to what [Carey]
> did know in the conversation in July at the restaurant, [it] comes in and
> [Carey] -- the statement that Mr. Carey supposedly made about saying,
> "We won't hear from those people again."

(*Id.* at #4110).

The district court agreed that Carey's self-serving introduction of Brockway's statement would probably open the door to Brockway and Maund's introduction of Carey's incriminating statement from the July 2020 meeting. (Trial Transcript, R. 461, #4113 ("I think that would open the door. It's your difficult choice, Mr. Perry, but it's your choice nonetheless.")). Given the district court's position on the issue, Carey made the strategic decision not to introduce evidence of Brockway's statement. (*Id.* at #4181). But Carey nevertheless elicited Conaway's testimony about the statement during a brief hearing conducted outside the presence of the jury, and in doing so, he marked a recording of the conversation as Carey Exhibit #3 and a transcript of the recording as Carey Exhibit #4. (*Id.* at #4283-84). Because Carey never introduced evidence of Brockway's statement, Maund and Brockway never recalled Peled to elicit his testimony about Carey's incriminating statement.

## C. The Jury Convicts the Defendants in a Split Verdict.

After deliberating for a day, the jury returned a split verdict finding (i) Maund guilty of conspiracy to commit murder-for-hire in Count One; and (ii) Brockway and Carey guilty of conspiracy to commit murder-for-hire in Count One and of the

kidnapping offenses in Counts Two and Three.[8]  (Criminal Minutes, R. 436, #2686; Maund Redacted Verdict Form, R. 437, #2687; Brockway Redacted Verdict Form, R. 439, #2693; Carey Redacted Verdict Form, R. 441, #2699). The jury did not consider Maund's guilt on Count Two because the district court had granted Maund's Rule 29 motion to dismiss that count, and it acquitted Maund of the substantive kidnapping charge in Count Three. (Criminal Minutes, R. 431, #2617; Maund Redacted Jury Verdict, R. 437, #2687).

## VI.   THE DISTRICT COURT DISCOVERS THAT CERTAIN EXHIBITS WERE ERRONEOUSLY SUBMITTED TO THE JURY AND, AFTER HOLDING A *REMMER* HEARING, GRANTS THE DEFENDANTS' MOTIONS FOR A NEW TRIAL.

After the trial, the district court clerk "received a number of requests for trial exhibits from the media." (Mem. Op. Granting New Trial, R. 561, #6391). While gathering the requested exhibits, the clerk discovered various "discrepancies between the exhibit list prepared during trial and exhibits provided to the jury." (*Id.*) The district court informed the parties of the discrepancies at a January 29, 2024, hearing. (*Id.*) Specifically, the court disclosed that three exhibits (two from the United States and one defense exhibit) admitted into evidence had *not* been provided to the jury, and that nine exhibits (two from the United States and seven from the defendants) not admitted into evidence *were* inadvertently provided to the jury. (*Id.*

---

[8] The jury likewise found that the defendants' murder-for-hire conspiracy (and Brockway and Carey's kidnapping offenses) caused Williams's and Lanway's deaths. (Defendants' Redacted Verdict Forms, R. 437, 439, 441). #2687).

at #6392). Most relevant here, the court disclosed that Carey Exhibit #3—the unredacted recording of a portion of the conversation between Brockway and Conaway in which Brockway stated that "Adam didn't know any of this sh*t"— and Carey Exhibit #4—a transcript of that conversation with the relevant statement underlined in ink—had erroneously been given to the jury. (*Id.*)  Each defendant responded to the court's disclosure by filing a separate Rule 33 motion for a new trial. (Defendants' Sealed Motions for New Trial, R. 491, 493, 496).

Each defendant argued that the court's erroneous submission of unadmitted exhibits to the jury amounted to structural error that mandated vacatur of their convictions and a new trial. (*Id.*). The defendants argued that the jury's exposure to inadmissible evidence—specifically, Carey Exhibits #3-4—was an error that "undermined one of the most fundamental tenets of our justice system: that a defendant's conviction may be based only on the evidence presented during trial." (*See, e.g.*, Maund Sealed Motion for a New Trial, R. 493 at 22)  And they further claimed that any *Remmer* hearing would be constitutionally inadequate, "given the circumstances surrounding the evidence at issue, the time that had passed since the trial, posttrial publicity,[9] and the restrictions on inquiry into jury deliberations

---

[9] In the aftermath of the trial, the TV program 20/20 aired a show titled "Sealed with a Kill" on ABC detailing the defendants' conduct and the trial. Representatives of the U.S. Attorney's Office were interviewed by 20/20's journalists, and portions of their comments were included in the show.

imposed by Fed. R. Evid. 606." (Mem. Op. Granting Motion for a New Trial, R. 561, #6393).

Brockway and Maund also argued that the erroneous submission of Carey Exhibits #3-4 to the jury prejudiced them because it adversely affected their Sixth Amendment right to confrontation, and because if Carey Exhibits #3-4 had been properly admitted, they would have introduced evidence of Carey's incriminating statement to Peled and Brockway at the July 2020 meeting. (Maund's Sealed Motion for a New Trial, R. 493, #23-33; Brockway's Sealed Motion for a New Trial, R. 491, #12). Curiously, Carey also claimed that the jury's exposure to Carey Exhibits #3-4—the very evidence his counsel *wanted* to introduce at trial—also violated his Sixth Amendment right to confrontation. (Carey's Sealed Motion for a New Trial, R. 496, #6).

The United States, for its part, argued that this Court's binding precedent required the district court to hold a *Remmer* hearing, and that, given the overwhelming (and properly admitted) evidence of the defendants' guilt, the jury's exposure to the unadmitted exhibits did not affect the verdict. (*Id.*) The district court set a *Remmer* hearing for May 15, 2024. (Order Setting *Remmer* Hearing, R. 526, #6031). The court began the *Remmer* hearing by explaining it would first examine each juror about his or her recollection of the unadmitted exhibits from a script that had been provided to the parties in advance. (*Remmer* Hearing Transcript, R. 542,

30

#6062-65). The court then gave the parties the opportunity to pose questions to the jurors that fell within the scope of Federal Rule of Evidence 606(b). (*Id.*) The court's (and the parties') questions largely focused on the jurors' recollection of Carey Exhibits #3-4.

After the hearing (and after receiving post-hearing briefs from the parties), the district court issued a 32-page memorandum opinion granting all three defendants' motions for a new trial. (Mem. Op. Granting New Trial, R. 561, #6388). In doing so, the court made the following factual findings regarding the jurors' exposure to Carey Exhibits #3-4:

> [T]he Court concludes that at least one of the jurors reviewed the unredacted transcript of the excerpt of the recording of the October 25, 2021 meeting between Brockway and Conaway, which was Carey Exhibit 4. It is also likely that jurors listened to the unredacted recording. Two jurors recognized the appearance of the USB drive that was Carey Exhibit 3 and one juror said that it was used to play a recording. If that juror's recollection is accurate, it would have exposed all of the jurors to the unredacted recording.

(*Id.* at #6411).[10] Then, despite acknowledging that the "harmless-error standard usually applies to circumstances in which extrinsic evidence has reached the jury,"

---

[10] At the hearing, 11 of the 12 jurors testified that they did not recall seeing a transcript (Carey Exhibit #4) during deliberations. (*Id.* at #6407 (citing hearing transcript)). Juror #2 recalled reviewing a transcript in the jury room, but she later clarified that she could be misremembering. (*Remmer* Hearing Transcript, R. 542, #6133-41). The jurors also recalled listening to conversations on a USB Drive, and at least two jurors recognized the USB Drive that contained Carey Exhibit #3 as one they listened to. (Mem. Op., R. 561, #6410). However, at least one similar USB

(*id.* at #6412), the district court refused to consider whether Carey Exhibits #3-4 had affected the jury's verdict, as is required by this Court's precedent.[11] (*Id.* at #6417-18).

Instead, the court concluded that the erroneous submission of Carey Exhibits #3-4 to the jury amounted to structural error. (*Id.* at #6416-17). The court first concluded that the jury's exposure to unadmitted exhibits resulted in "fundamental unfairness" to the defendants because the unadmitted evidence was delivered to the jury with "the apparent imprimatur of the Court." (*Id.*) Next, the court explained that it could not conduct a harmless-error analysis because the effect of its error was "simply too hard to measure." (*Id.* at #6417). The court believed this was so because "any inquiry into prejudice would necessitate consideration not only of the effects of the evidence erroneously presented to the jury, but also the effects of evidence **not** presented"—*i.e.*, Carey's July 2020 incriminating statement to Peled and Brockway—"not to mention speculation about the potential arguments of counsel

Drive with properly admitted evidence was also in the jury room, and the multiple of jurors recalled listening to recordings on CDs, not flash drives. (*See, e.g.*, *Remmer* Hearing Transcript, R. 542, #6145-46, 6149, 6176, 6199-6203). In any event, the United States does not challenge the district court's factual findings regarding the extent of any jury exposure to Carey Exhibits #3-4 for purposes of this appeal.

[11] The district court applied the harmless error standard to the other extraneous evidence submitted to the jury, including cumulative photographs of ammunition and an unredacted spreadsheet, and held that the jury's exposure to those exhibits did not prejudice the verdict. (Mem. Op., R. 561, #6395 n. 5-6). The United States is not challenging this aspect of the court's opinion.

had the various exhibits been properly admitted." (*Id.* at #6417-18). The court clarified that "[h]ad the same circumstances occurred without Brockway or Maund stating what they would do if Carey sought to admit his Exhibit 3," then its error *would* have been subject to harmless-error review. (*Id.* at #6418). But because "nobody can measure, with any degree of certainty, the effects of something that did not happen"—that is, the effect of Carey's July 2020 statement had it been offered and admitted—the court deemed its error a structural one. (*Id.*)

The court thus granted the defendants' motions for a new trial. This appeal follows.

## SUMMARY OF THE ARGUMENT

The district court abused its discretion in finding that its error in exposing the jury to Carey Exhibits #3-4 was a structural one. Whether this Court views the district court's error as a case of an extraneous influence or as a kind of *Bruton* error, this Court's (and the Supreme Court's) binding precedent required the district court to assess the prejudicial impact of its error. The district court was wrong to ignore this precedent in favor of a novel application (and breathtaking enlargement) of the structural error doctrine. This Court should, at a minimum, vacate the district court's order granting the defendants a new trial and remand the case with instructions for the court to assess whether its error was a harmless one.

However, this Court plainly has authority to assess harmlessness for itself, and it should exercise that authority here, given the fulsome record below and the overwhelming admissible evidence of the defendants' guilt. Here, the jury heard substantial admissible evidence, including cooperator testimony, the defendants' recorded statements, and electronic and physical evidence, of the defendants' guilt. The combination of the overwhelming admissible evidence of the defendants' guilt and the fact that (a) Carey Exhibits #3-4 did not inculpate the defendants; and that (b) testimony about Carey's July 2020 incriminating statement would not have exculpated *any* defendant demonstrates that the district court's error was harmless under any standard.

34

## ARGUMENT

### I.    THE DISTRICT COURT ABUSED ITS DISCRETION IN CONCLUDING THAT THE JURY'S EXPOSURE TO CAREY EXHIBITS #3-4 WAS STRUCTURAL ERROR.

The district court abused its discretion when it classified the jury's exposure to Carey Exhibits #3-4 as one of the "very limited class of" errors warranting automatic vacatur of the defendants' convictions—that is, a structural error. Regardless of whether one views the jury's exposure to Carey Exhibits #3-4 as an extraneous influence under *Remmer* or as a potential Confrontation Clause violation under *Bruton*, this Court's (and the Supreme Court's) binding precedent required the district court to assess the prejudicial impact of its error using the familiar harmless-error analysis. The district court misapplied the law in failing to do so. This Court should therefore vacate the district court's order granting the defendants a new trial.

### A. Standard of Review

Federal Rule of Criminal Procedure 33 allows district courts to "grant [] a new trial where substantial legal error has occurred." *United States v. Robinson*, 99 F.4th 344, 367 (6th Cir. 2024). "The introduction of extraneous *prejudicial* information into the jury room" is a substantial legal error that may be sufficient to warrant a new trial, *United States v. Mix*, 791 F.3d 603, 608 (5th Cir. 2015) (emphasis added); Charles Alan Wright, Arthur R. Miller, & Sarah N. Welling, 3 *Federal Practice and Procedure: Criminal* § 587 (5th ed. June 2024), as is a *Bruton* error that is not harmless beyond a reasonable doubt, *United States v. Macias*, 387 F.3d 509, 520

(6th Cir. 2004). However, "the mere occurrence of . . . extraneous information . . . is not, without evidence of actual prejudice, enough to warrant a new trial." *In re Sittenfeld*, 49 F.4th 1061, 1067 (6th Cir. 2022). The same is true for harmless *Bruton* errors.  *Schneble v. Florida*, 405 U.S. 427, 430 (1972).

This Court "review[s] a district court's decision to grant a Rule 33 motion" for a new trial "for abuse of discretion." *United States v. Munoz*, 605 F.3d 359, 366 (6th Cir. 2010). An "abuse of discretion occurs when a district court relies on clearly erroneous findings of fact, improperly applies the law, or uses an erroneous legal standard." *Id.* This Court reviews the question of whether the district court applied the proper legal standard under Rule 33 *de novo*. *United States v. Willis*, 257 F.3d 636, 642 (6th Cir. 2001).

## B. Law

### 1. The Structural Error Doctrine

The Constitution "entitles a criminal defendant to a fair trial, not a perfect one." *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986). Generally, "if the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other errors that may have occurred are subject to harmless-error analysis." *Rose v. Clark*, 478 U.S. 570, 579 (1986).  Only exceptional errors that "affect the framework within which the trial proceeds" constitute structural errors that cannot be deemed harmless, and that require automatic vacatur of a

36

defendant's conviction. *Weaver v. Massachusetts*, 582 U.S. 286, 295 (2017) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991)). The Supreme Court has therefore applied the structural error doctrine to "a very limited class of cases" involving the denial of counsel, a biased trial judge, racial discrimination in the selection of a grand jury, denial of self-representation at trial, denial of a public trial, and a defective reasonable doubt instruction. *Neder v. United States*, 527 U.S. 1, 8 (1999) (citing cases). And it has explained that courts should not take a "case-by-case approach" in assessing whether a given error is structural. *Id.* at 14. That is, "an error is either structural or it is not." *Id.*

"By contrast, discrete defects in the criminal process—such as omission of a single element from the jury instructions," a *Bruton* error, or an extraneous influence on the jury—"are not structural because they do not 'necessarily render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence.'" *Greer v. United States*, 593 U.S. 503, 513-14 (2021) (quoting *Neder*, 527 U.S. at 8). It should come as no surprise then that the Supreme Court (as well as this Court) has repeatedly subjected purported *Bruton* errors and challenges to external influences on jurors to harmless error analysis. *Schneble*, 405 U.S. at 430; *In re Sittenfeld*, 49 F.4th at 1066-67 ("[T]o justify a new trial, the defendant must prove at the *Remmer* hearing that the improper contact caused actual prejudice to the verdict.").

37

### 2. *Extraneous Influences and* **Remmer** *Hearings*

This Court has described a *Remmer* hearing as

> [c]oncern[ing] a defendant's Sixth Amendment right to "a fair trial by a panel of impartial, indifferent jurors." *United States v. Perry*, 438 F.3d 642, 651 (6th Cir. 2006) (citation omitted). In *Remmer v. United States*, . . . the Supreme Court held that "unauthorized invasions" on the jury proceedings can oblige the trial court to "determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate."

*In re Sittenfeld*, 49 F.4th at 1066. Thus, "a *Remmer* hearing is required when a defendant presents a 'colorable claim' that extraneous information or contact had an obvious or likely adverse effect on the jury." *Id.* In this Circuit, the defendant bears the burden of proving—at the *Remmer* hearing—that "the improper contact caused actual prejudice to the verdict." *Id.*

Courts have assessed whether extraneous information has caused "actual prejudice" to the jury's verdict by "considering the totality of the circumstances, including the nature of the extrinsic evidence, the manner that the evidence reached the jury, the factual findings, the investigation, and the strength of the government's case." Charles Alan Wright, et al., 3 *Federal Practice and Procedure: Criminal* § 587 (footnotes omitted). Against this legal backdrop, federal courts have denied a defendant's motion for a new trial where the totality of the circumstances demonstrates that the extraneous evidence was not prejudicial, *see, e.g.*, *United States v. Smith*, 354 F.3d 390, 395-96 (5th Cir. 2003) (affirming district court's denial of defendant's request for new trial in part because jury's exposure to

unadmitted transcript that "was largely cumulative of testimony that was properly before the jury" was not prejudicial), and where admissible evidence of the defendant's guilt was overwhelming, *see, e.g.*, *United States v. Chanthadara*, 230 F.3d 1237, 1251-52 (10th Cir. 2000) (holding that jurors' exposure to newspaper article in which judge called the defendant's theory of the case a "smoke screen" to be harmless due to the overwhelming evidence of the defendant's guilt); *United States v. Sababu*, 891 F.2d 1308, 1333-34 (7th Cir. 1989) ("We also accept the district court's judgment that there was not a 'reasonable possibility' that the transcript affected the jury's conviction on the conspiracy charge because there was other ample evidence of Garcia's involvement in the conspiracy.").

A district court's consideration of prejudice is not optional. As this Court has explained time, *United States v. Kechego*, 91 F.4th 845, 850 (6th Cir. 2024), time, *In re Sittenfeld*, 49 F.4th at 1066-67, time, *Cunningham v. Shoop*, 23 F.4th 636, 649-50 (6th Cir. 2022), and time again, *United States v. Lanier*, 988 F.3d 284, 295 (6th Cir. 2021), courts confronting a case of extraneous influence *must* consider whether the defendant has proven (usually through a *Remmer* hearing) that the influence established actual prejudice to the verdict. This Court's sister circuits have reached the same conclusion. *See, e.g.*, *United States v. Warner*, 498 F.3d 666, 679 (7th Cir. 2007) (The Supreme "Court repeatedly has subjected challenges to external influences on jurors to harmless error analysis."); *United States v. Tejada*, 481 F.3d

44, 50 & n.1 (1st Cir. 2007); *United States v. Dutkel*, 192 F.3d 893, 899 n.4 (9th Cir. 1999); *see also Bomar v. Wetzel*, 2024 WL 1485838, at *6 (E.D. Pa. Apr. 5, 2024) ("classifying juror exposure to extraneous influence as structural error would be inconsistent with *Remmer*, which held such exposure should be evaluated in terms of prejudice").[12] This case law comports with the Supreme Court's "analy[sis of] outside intrusions upon the jury for prejudicial impact." *United States v. Olano*, 507 U.S. 725, 738 (1993). In the final analysis, the ultimate question in the *Remmer* context is whether the extraneous influence "affected the jury's deliberations and thereby its verdict." *Id.* at 739.

### 3. Bruton *and Confrontation Clause Violations*

"The Sixth Amendment's Confrontation Clause guarantees the right of a criminal defendant to be confronted with the witnesses against him." *Samia v. United States*, 599 U.S. 635, 643 (2023) (internal quotation marks omitted). In *Bruton v. United States*, the Supreme Court held "that a defendant is deprived of his Sixth Amendment right of confrontation when the facially incriminating confession of a nontestifying codefendant is introduced at their joint trial." *Id.* at 647 (quoting *Richardson v. Marsh*, 481 U.S. 200, 207 (1987)). The Confrontation Clause—and therefore *Bruton*—only concerns testimonial statements—*i.e.*, statements whose

---

[12] However, this Circuit is "the only circuit that places on the defendant the burden of proving bias at the *Remmer* hearing rather than requiring the Government to show 'that an unauthorized contact was harmless." *Lanier*, 988 F.3d at 295.

"primary purpose" is to create an out-of-court substitute for trial testimony." *United States v. Lundy*, 83 F.4th 615, 620 (6th Cir. 2023). Further, any *Bruton* violation is subject to harmless error analysis. *Schneble*, 405 U.S. at 430.

* * *

In sum, the Supreme Court and this Court have repeatedly and squarely held that errors similar to the one at issue here—whether classified as an extraneous influence on the jury or a *Bruton* error—are not part of "the very limited class of" errors that fall within the structural error doctrine. *Neder*, 527 U.S. at 8.

### C. The District Court Abused Its Discretion in Finding that the Jury's Exposure to Carey Exhibits #3-4 Amounted to Structural Error.

The district court abused its discretion by refusing to review the jury's exposure to Carey Exhibits #3-4 for harmlessness. The district court grounded its decision in its concern that Maund and Brockway may have introduced additional evidence to rebut those exhibits had they known of the jury's exposure to them. (Mem. Op. Granting New Trial, R. 561, #6417-18). But regardless of whether one views the jury's exposure to Carey Exhibits #3-4 through the lens of *Remmer* or *Bruton*, binding precedent required the district court to conduct a harmlessness analysis. *Olano*, 507 U.S. at 738-39; *Schneble*, 405 U.S. at 430; *Lanier*, 988 F.3d at 295; *Stanford v. Parker*, 266 F.3d 442, 446 (6th Cir. 2001) ("Where a *Bruton*

violation occurs, a court *must* then determine whether that violation is harmless." (emphasis added)).[13] The district court abused its discretion in failing to do so.

Further, even setting that binding precedent to one side, the district court's rationale for applying the structural error doctrine here is unconvincing on its own terms. In concluding that the error was structural, the district court cited *Weaver v. Massachusetts*, 582 U.S. 286 (2017), for the proposition that the effects of the erroneous admission of Carey Exhibits #3-4 "are simply too hard to measure" because the proper admission of Carey Exhibit #3 might have led "to additional admissible evidence." (Mem. Op. Granting Motion for New Trial, R. 561, #6417). The district court believed that this foreclosed a harmlessness inquiry. (*Id.* at #6417-18).

But the district court vastly overread *Weaver*. In noting that certain errors introduce immeasurable effects, *Weaver* cited a case in which the defendant was denied the right to select his own attorney—bearing consequences that are "necessarily unquantifiable and indeterminate" because an attorney's strategic decisions pervade the life of a case. *United States v. Gonzalez-Lopez*, 548 U.S. 140, 150 (2006) (internal quotations omitted). As the Supreme Court noted in *Gonzalez-*

---

[13] To be clear, the United States does not concede that the jury's exposure to Carey Exhibits #3-4 resulted in a *Bruton* violation. Not only was Brockway's statement on those exhibits non-testimonial, but it also was not facially incriminating toward any defendant. *Samia*, 599 U.S. at 647.

*Lopez*, an attorney's strategic decisions influence whether the defendant proceeds to trial at all. *Id.* The "unquantifiable and indeterminate" effect of the denial of counsel of choice in *Gonzalez-Lopez*, *id.*; *see also Mccoy v. Louisiana*, 584 U.S. 414, 427 (2018) (noting that "[a]n error might also count as structural when its effects are too hard to measure, as is true of the right to counsel of choice"), is a far cry from this case, which involved only Brockway's single unadmitted statement in Carey Exhibits #3-4 and the possibility that Brockway and Maund would respond to that statement by eliciting evidence of a prior non-exculpatory statement from Carey.

The district court's reasoning here proves far too much. If the effect of the jury's exposure to Brockway's single unadmitted statement in Carey Exhibits #3-4 was "simply too hard to measure" (Mem. Op. Granting New Trial, R. 561, #6417), then it seems almost every trial error or extraneous influence could be deemed structural error and result in automatic vacatur of a defendant's conviction. Ordinary evidentiary errors—such as the erroneous admission (or exclusion) of an exhibit under the Federal Rules of Evidence—often have domino effects. For example, the admission (or exclusion) of any given piece of evidence may make other related evidence relevant (or irrelevant) to the case. But that does not make every evidentiary error a structural one. Neither the Supreme Court's nor this Court's precedent countenance such a staggering enlargement of the structural error

43

doctrine.[14] Rather, as explained in **Section II.B** below, the harmlessness inquiry is straightforward here, and it was incumbent on the district court to identify what additional evidence might have been admitted based on Carey Exhibits #3-4 and explain how any such additional evidence would have affected the jury's deliberations. *See Schneble*, 405 U.S. at 430 (reviewing court should evaluate "the prejudicial effect of the codefendant's admission" against "the properly admitted evidence of guilt").

Finally, the district court's contention that "other courts have found structural error when the Court provided the jury incriminating evidence that had not been presented at trial" does not change the calculus. (Mem. Op. Granting New Trial, R. 561, #6417 n.17). As noted, the United States is not aware of any Supreme Court or Sixth Circuit case concluding that cases of extraneous influence or alleged *Bruton* errors amount to structural error. The district court, for its part, all but conceded the point and relied on a single Ninth Circuit case, *United States v. Noushfar*, 78 F.3d 1442, 1445 (9th Cir. 1996), *amended by United States v. Noushfar*, 78 F.3d 1442

---

[14] The district court also based its structural error finding on its belief that the erroneous submission of Carey Exhibits #3-4 resulted in "fundamental unfairness to these defendants." (Mem. Op. Granting New Trial, R. 561, #6417). This rationale is unavailing because the Supreme Court has explained that an error is "deemed structural if the error *always* results in fundamental unfairness." *Weaver*, 582 U.S. at 296 (emphasis added). As the district court conceded, extraneous influences like the one at issue "do not result in fundamental unfairness in every case." (Mem. Op. Granting New Trial, R. 561, #6416-18). Under *Neder*, this concession should have foreclosed a finding of structural error. 527 U.S. at 14.

(9th Cir. 1996), to support its finding of structural error. (Mem. Op. Granting New Trial, R. 561, #6417 n.17). *Noushfar* is inapplicable here because the district court there affirmatively "allowed the jury to take [without any limiting instructions and over the defendant's "vigorous objections"] to the jury room fourteen tapes that had not been played in the courtroom," and that contained "many potentially incriminating conversations with the defendants." *Noushfar*, 78 F.3d at 1442. Perhaps unsurprisingly, the Ninth Circuit concluded that this situation was unconstitutional, and that the court's *intentional* abdication of its role as the gatekeeper of evidence was not amenable to harmless error analysis and required vacatur of the defendant's conviction. *Id.* at 1443. That situation is a far cry from this district court's unintentional error which resulted in the jury's exposure to a single, non-prejudicial statement (that one defendant wanted to introduce in his case-in-chief in any event).

The Ninth Circuit has itself recognized the limits of *Noushfar* by largely confining that case to its facts and explaining that extraneous influences do not amount to structural error. *Dutkel*, 192 F.3d at 899 n.4; *see Eslaminia v. White*, 136 F.3d 1234, 1237 (9th Cir. 1998) (explaining that "[t]he quantity of the extrinsic evidence [in *Noushfar*] and its incriminating character made it impossible for the reviewing court to determine the impact on jurors"). And whatever its merits, *Noushfar* does not abrogate this Court's binding precedent, which required the

45

district court to review the erroneous submission of Carey Exhibits #3-4 for harmlessness. *See, e.g.*, *Lanier*, 988 F.3d at 295.

\* \* \*

In sum, the district court abused its discretion when it ignored this Court's binding precedent and concluded that the jury's exposure to a single unadmitted statement in Carey Exhibits #3-4 amounted to structural error. This Court should, at a minimum, vacate the district court's order granting the defendants a new trial and remand the case so that the district court may appropriately consider whether the jury's exposure to Carey Exhibits #3-4 was harmless.

## II.    THE JURY'S EXPOSURE TO CAREY EXHIBITS #3-4 IS A HARMLESS ERROR UNDER ANY STANDARD.

Although this Court often remands cases to the district court so that it may conduct the appropriate harmlessness inquiry in the first instance, *see, e.g.*, *United States v. Mallory*, 902 F.3d 584, 597 (6th Cir. 2018), this Court "plainly ha[s] the authority to" assess harmlessness itself. *See United States v. Hastings*, 461 U.S. 499, 510 (1983). The Supreme Court has previously exercised that authority in similar contexts, *Schneble*, 405 U.S. at 430-32, and this Court should do the same here, given the fulsome record and the overwhelming admissible evidence of the defendants' guilt. Here, the admissible incriminating evidence including cooperator testimony, the defendants' recorded incriminating statements, and electronic and physical evidence tying the defendants to the murder-for-hire scheme, demonstrates

that the jury's exposure to Carey Exhibits #3-4 was harmless under any standard. This Court should therefore reverse the district court's order granting a new trial and remand the case with instructions that the district court reinstate the defendants' convictions.

### A. Standard of Review

As previously noted, *supra* in **Section I.B.2**, there is a Circuit split on the question of which party bears the burden of showing prejudice in the *Remmer* context. In this Circuit, defendants must show that the extraneous influence was prejudicial, while every other court of appeals to consider the issue has placed the burden of establishing harmlessness on the United States. *Lanier*, 988 F.3d at 295 n. 13. Complicating matters further, this Court has held that the United States bears the burden of showing that *Bruton* errors are harmless beyond a reasonable doubt, *United States v. McGee*, 529 F.3d 691, 697 (6th Cir. 2008), even where (as here) it is unclear that the error is of a constitutional dimension. *See United States v. Hendrickson*, 822 F.3d 812, 824 (6th Cir. 2012) (assuming without deciding that the error must be harmless beyond a reasonable doubt where it was unclear whether the error was constitutional).

The Court need not decide which party bears the burden of establishing harmlessness here because the United States concedes for purposes of this appeal that it must demonstrate that the jury's exposure to Carey Exhibits #3-4 was

harmless beyond a reasonable doubt.[15] A purported constitutional error is harmless where "the government has made it clear 'beyond a reasonable doubt that the outcome would not have been different' without the constitutional violation." *United States v. Campbell*, 122 F.4th 624, 630 (6th Cir. 2024).

### B. Law

A constitutional error—including a jury's exposure to extraneous information—is harmless if the United States has proved "beyond a reasonable doubt that the outcome would not have been different without" the error. *Campbell*, 122 F.4th at 630; *Lanier*, 988 F.3d at 295 n.13. As the Supreme Court has explained, "a host of factors" inform this Court's harmlessness analysis, including

> the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, ***and, of course, the overall strength of the prosecution's case***.

*Van Arsdall*, 475 U.S. at 684 (emphasis added).

In applying these factors, this Court has repeatedly found constitutional errors, including *Bruton* errors, to be harmless beyond a reasonable doubt where a

---

[15] In granting the defendants' motions for a new trial, the district court stated that the United States argued below that the defendants bore the burden of showing prejudice. (Mem. Op. Granting New Trial, R. 561, #6413-14). To the contrary, the United States maintained throughout the *Remmer* proceedings that the extraneous influence was harmless under any standard. (*See, e.g.*, United States' Combined Response, R. 550, #6332).

defendant has confessed to his participation in the offense of conviction, *Stanford*, 266 F.3d at 457, where "overwhelming" admissible evidence otherwise supports the jury's verdict, *United States v. Winston*, 55 F. App'x 289, 296 (6th Cir. 2003), and where the erroneously admitted evidence is merely cumulative of the defendant's guilt, *United States v. Rogers*, 580 F. App'x 347, 351-52 (6th Cir. 2014); *see also United States v. Treadwell*, 760 F.2d 327, 339 (D.C. Cir. 1985) (explaining that "when an extraneous document submitted to the jury is merely cumulative of other, properly admitted evidence, the transmittal is harmless error"). Further, a defendant is entitled to a new trial on the basis of evidence a jury did not hear only if there is "a strong exculpatory connection between the newly discovered evidence and the facts that were presented at trial." *United States v. Quiles*, 618 F.3d 383, 393 (3d Cir. 2010).

> **C. Given the Overwhelming Admissible Evidence of the Defendants' Guilt, the Jury's Exposure to Carey Exhibits #3-4 Was Harmless Beyond a Reasonable Doubt.**

Given the "overwhelming" admissible evidence of the defendants' guilt, the jury's exposure to Carey Exhibits #3-4 was harmless beyond a reasonable doubt. As set forth in **Section V.A**, a mountain of admissible evidence—including the defendants' own recorded statements confessing to their involvement in the murders, cooperator and witness testimony, surveillance footage, and bank records—established each of the defendants' guilt beyond a reasonable doubt. The

overwhelming admissible evidence supporting each defendant's conviction is addressed in turn.

**Adam Carey**. The jury heard Peled's testimony directly implicating Carey in the murder-for-hire scheme, (Trial Transcript, R. 458, #3349-60), and it listened to Carey's own recorded statements to Conaway explaining mistakes he made during the murder-for-hire scheme. (United States Trial Exhibit #125). Further, it listened to a recording of Carey offering to join Conaway's fictional murder-for-hire scheme (*id.*), and to Conaway's testimony that Carey had confessed to committing the murders in exchange for cash. (Trial Transcript, R. 461, #4003). It also heard witness testimony (which was corroborated by surveillance footage and other electronic evidence) that placed Carey at Williams's apartment in the days leading up to the murders. (*See, e.g.*, Trial Transcript, R. 457, #3164-66; Trial Transcript, R. 460, #3972-74). This and other admissible evidence easily established Carey's guilt on Counts One through Three and rendered the jury's exposure to Carey Exhibits #3-4 harmless as to Carey. *Winston*, 55 F. App'x at 296.

Indeed, it is difficult to understand how the jury's exposure to Carey Exhibits #3-4 could possibly have been harmful to Carey at all.[16] Recall that Carey's counsel

---

[16] The jury's exposure to Carey Exhibit #4—the transcript of Carey Exhibit #3— was also harmless as to Carey (and his co-defendants) because the jury was specifically instructed that transcripts are not evidence. (Trial Transcript, R. 454, #2937-38); *see Samia*, 599 U.S. at 646 (noting "the law's broad[] assumption that jurors can be relied upon to follow the trial court's instructions").

wanted to introduce Carey Exhibit #3 as evidence (presumably because he believed it supported his theory that Carey was a mere bystander to Williams's and Lanway's murders) until the district court implied that his doing so would probably open the door to the jury's consideration of Carey's incriminating statement during his July 2020 meeting with Peled and Brockway. *See supra* **Section V.B**. The erroneous submission of Carey Exhibits #3-4, then, only helped Carey because the jury was exposed to Brockway's statement (purportedly) exculpating him in Carey Exhibit #3 while it was never exposed to Peled's testimony detailing Carey's incriminating statement at the July 2020 meeting. The jury's exposure to Carey Exhibits #3-4— which contained a statement that Carey *wanted*[17] the jury to consider—did not contribute to his conviction, and there is no reasonable doubt on this point. *See Winston*, 55 F. App'x at 296.

**Bryon Brockway**. At trial, the jury listened to a recording of Brockway confessing to Lanway's murder and Williams's kidnapping and murder (United States Trial Exhibit #131), and it heard Peled's testimony, which directly implicated Brockway in the murder-for-hire scheme. (Trial Transcript, R. 458, #3349-60). This

---

[17] While Carey did not invite the district court's erroneous submission of Carey Exhibits #3-4 simply by stating (and then withdrawing) his intention to introduce them as evidence, *see Macias*, 387 F.3d at 521-22 (discussing the invited error doctrine in the context of a *Bruton* violation), the fact that Carey ultimately obtained the precise result he argued for at trial means he cannot seriously argue now that the result prejudiced him.

evidence, standing alone, rendered the jury's exposure to Carey Exhibits #3-4 harmless as to Brockway. *Winston*, 55 F. App'x at 296; *Stanford*, 266 F.3d at 457. And other witness testimony and physical and electronic evidence corroborated both Brockway's confession and Peled's testimony, thereby establishing "overwhelming" admissible evidence of Brockway's guilt. *See supra* **Section V.B**. The jury's exposure to Brockway's statement purportedly exculpating Carey does not call any of this evidence into question.

Brockway argued below that the erroneous submission of Carey Exhibits #3-4 prejudiced him because he was "deprived of the right to put on proof to rebut" the exhibits—namely evidence of Carey's incriminating July 2020 statement—and because he did not have the opportunity to "address" the impact of the exhibits in closing arguments. (Brockway's Motion for a New Trial, R. 491, #12-13). But, at trial, Brockway's counsel had told the district court that Brockway had no "objection" to Carey admitting Brockway's statement. (Trial Transcript, R. 461, #4110). Moreover, Carey's incriminating statement—made in Brockway's presence—in no way exculpates Brockway or otherwise diminishes the probative force of his confession and other overwhelming evidence of his guilt. *See Stanford*, 266 F.3d at 456. Instead, the jury's consideration of Carey's statement would likely have only further connected Brockway to Carey and Peled—and by extension, the murder-for-hire scheme.

Finally, Brockway's complaint that he did not have the chance to rebut Carey Exhibits #3-4 in closing arguments rings hollow. His counsel argued extensively that Carey was the "loose cannon" who bore responsibility for the murders. (Trial Statement, R. 457, #3005; Trial Statement, R. 454, #2852-53). Brockway was not prejudiced through his inability to add to an argument that the jury considered and rejected by also convicting Brockway. *See generally United States v. Saada*, 212 F.3d 210, 217-18 (3d Cir. 2000) (explaining, albeit in the context of a request for a new trial on the basis of new evidence, that unadmitted evidence supporting defendant's theory of the case did not warrant a new trial where the jury considered and rejected defendant's argument at trial). Accordingly, the jury's exposure to Carey Exhibits #3-4 was harmless as to Brockway as well.

***Erik Maund***. As with Carey and Brockway, the jury listened to Peled's testimony implicating Maund in the murder-for-hire scheme, (Trial Transcript, R. 458, #3349-60), and it heard Maund make incriminating statements about his role in the scheme in a recorded call with Peled. (United States Trial Exhibit #125). This substantial evidence of guilt was corroborated by Dimeo's testimony that he had connected Maund with Peled in an effort to help Maund handle Lanway's extortionate demands (Trial Transcript, R. 458, #3285-86), by bank records, which showed (among other things) that Maund transferred $150,000 in cash to Peled on the afternoon of the murders, and by other evidence (including Maund's own

admissions) showing that Maund met Williams in Nashville, that Lanway then engaged in increasingly brazen attempts to extort him, and that Maund and Peled met at Maund's home on the night of March 11. (Trial Transcript, R. 457, #3108-23; Trial Transcript, R. 459, #3611, 3613-14; United States Trial Exhibit #117). In the face of this overwhelming evidence of guilt, Maund cannot show that the jury's erroneous exposure to a co-conspirator's non-exculpatory statement in Carey Exhibits #3-4 and his corresponding inability to introduce evidence of Carey's incriminating statement was anything but harmless. *See Rogers*, 580 F. App'x at 351-52.

In district court, Maund argued extensively that he was prejudiced by the jury's exposure to Carey Exhibits #3-4 because, if those exhibits were properly admitted, "the course of trial would have been altered" by his or Brockway's "likely recall" of Peled to testify about Carey's incriminating statement at the July 2020 meeting. (Maund Sealed Motion for a New Trial, R. 493, #30-31; Maund Post-Hearing Brief, R. 556, #6379-80). But Maund has not (and cannot) show why the combination of the jury's consideration of Brockway's single unadmitted statement and his inability to elicit testimony about Carey's incriminating statement exculpate him. The jury heard testimony directly implicating Maund in the murder-for-hire scheme that was corroborated by bank records, electronic evidence, and Maund's own admissions. Given this reality, the jury's consideration of a single unadmitted

statement purportedly exculpating Carey and Maund's inability to admit a statement further incriminating Carey was harmless beyond a reasonable doubt.[18]

## CONCLUSION

For the reasons stated herein, the United States respectfully submits that this Court should reverse the district court's order granting the defendants a new trial and remand the case with instructions for the district court to reinstate the defendants' convictions.

Respectfully submitted,

ROBERT E. McGUIRE
Acting United States Attorney for the
Middle District of Tennessee

*/s/ Rascoe Dean*
RASCOE DEAN
BROOKE CAREY FARZAD
Assistant United States Attorneys
719 Church Street, Suite 3300
Nashville, Tennessee 37203
(615) 736-5151

*Attorneys for Plaintiff-Appellants*

---

[18] The jury's split verdict as to Maund also refutes Maund's contention that countering the evidence in Carey Exhibits #3-4 was crucial to his defense. (Maund Sealed Motion for a New Trial, R. 493, #29-31). Since the jury convicted Carey of all three counts charged against him, despite its exposure to the purportedly exculpatory evidence in Carey Exhibits #3-4, and returned a split verdict as to Maund, Maund cannot credibly argue that the jury relied on Carey Exhibits #3-4 to his detriment. *See United States v. Pelullo*, 14 F.3d 881, 899 (3d Cir. 1994) ("[A] discriminating acquittal on one of the counts" can constitute "evidence that the jury was able to overcome any prejudice.").

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned hereby certifies that this brief contains 12,984 words, exclusive of the table of contents, table of authorities, and certifications, and therefore complies with the limitations on length of a brief set forth at Rule 32(a)(7)(B)(I) of the Federal Rules of Appellate Procedure.

*/s/ Rascoe Dean*
RASCOE DEAN

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on this the 29th day of January, 2025, an electronic copy of this brief was served via the Court's electronic filing system upon:

**COUNSEL FOR ERIK MAUND:**

***John-David Thomas, Esq.***
Barnes & Thornburg, LLP
1600 West End Avenue, Suite 800
Nashville, TN 37203-3494
jd.thomas@btlaw.com

***Samuel Bassett, Esq.***
Minton, Bassett, Flores, & Carsey, PC
1100 Guadalupe St.
Austin, TX 78701
sbassett@mbfc.com

***David Gonzalez, Esq.***
Sumpter & Gonzalez, L.L.P.
3011 N. Lamar, Ste. 200
Austin, TX 78705
david@sg-llp.com

***Perry Minton, Esq.***
Minton, Bassett, Flores, & Carsey, PC
1100 Guadalupe St.
Austin, TX 78701
pminton@mbfc.com

**COUNSEL FOR ADAM CAREY:**

***John Bailey, Esq.***
330 Franklin Road, Suite 135A-427
Brentwood, TN 37027
hansgurkin@att.net

***Benjamin Perry, Esq.***
Law Office of Benjamin H. Perry
40 Music Square East, Suite 100
Nashville, TN 37203
ben@benperrylaw.com

**COUNSEL FOR BRYON BROCKWAY:**

***Luke Evans, Esq.***
Evans Bulloch Parker PLLC
302 North Spring Street
Murfreesboro, TN 37133-0398
lukeevans@bfhelaw.com

*/s/ Rascoe Dean*
RASCOE DEAN

# ADDENDUM

## APPELLEE'S DESIGNATION OF
## RELEVANT DISTRICT COURT DOCUMENTS

Appellee, pursuant to 6th Cir. R. 28(c) and 6th Cir. R. 30(b), hereby designates

the following relevant district court documents in the electronic record:

| Record Entry No. | Description of Document | PageID #: |
|---|---|---|
| Case No. 3:21-cr-00288 (M.D. Tenn.) | | |
| R. 2 | Order to Seal | 3-4 |
| R. 3 | Indictment | 58-69 |
| R. 127 | Superseding Indictment | 516-527 |
| R. 137 | Carey's Motion to Sever | 552-563 |
| R. 139 | Maund's Motion to Sever | 565-578 |
| R. 176 | Memorandum Opinion Denying Motion | 804-809 |
| R. 210 | Criminal Minutes | 1163 |
| R. 211 | Sealed Order Accepting Plea Petition and Agreement | 1164-1187 |
| R. 251 | Brockway's Motion to Sever | 1324-1335 |
| R. 279 | Memorandum Opinion Denying Motion | 1405-1411 |
| R. 393 | Criminal Minutes | 2275 |
| R. 431 | Criminal Minutes | 2617 |
| R. 436 | Criminal Minutes | 2686 |
| R. 437 | Maund Redacted Jury Verdict Form | 2687-2689 |
| R. 439 | Brockway Redacted Jury Verdict Form | 2693-2695 |
| R. 441 | Carey Redacted Jury Verdict Form | 2699-2701 |
| R. 454 | Trial Transcript | 2750-2957 |
| R. 457 | Trial Transcript | 2960-3258 |
| R. 458 | Trial Transcript | 3259-3539 |

| R. 459 | Trial Transcript | 3540-3842 |
|--------|------------------|-----------|
| R. 460 | Trial Transcript | 3843-4077 |
| R. 461 | Trial Transcript | 4078-4286 |
| R. 463 | Trial Transcript | 4404-4651 |
| R. 491 | Brockway Sealed Motion for New Trial | *Sealed* |
| R. 493 | Maund Sealed Motion for New Trial | *Sealed* |
| R. 496 | Carey Sealed Motion for New Trial | *Sealed* |
| R. 526 | Order Setting *Remmer* Hearing | 6031-6033 |
| R. 542 | *Remmer* Hearing Transcript | 6058-6251 |
| R. 550 | United States' Combined Response | 6332-6353 |
| R. 556 | Maund Post-Hearing Brief | 6371-6382 |
| R. 561 | Memorandum Opinion Granting New Trial | 6388-6419 |
| R. 565 | Notice of Appeal | 6425-6426 |