CASE NO.: 24-5932

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,
Plaintiff/Appellant,

v.

ADAM CAREY,
Defendant/Appellee.

On Appeal from the United States District Court
for the Middle District of Tennessee, Nashville Division
William L. Campbell, Jr., Chief U.S. District Judge, No. 3:21-cr-00288

RESPONSE BRIEF OF APPELLEE
ADAM CAREY

Benjamin H. Perry
40 Music Square East, Suite 100
Nashville, Tennessee 37203-4323
(615) 242-4200
ben@benperrylaw.com

John Bailey
330 Franklin Road, Suite 135A-427
Brentwood, TN 37027
(615) 319-1342
hansgurkin@att.net

*Attorneys for Adam Carey,
Defendant-Appellee*

## **TABLE OF CONTENTS**

TABLE OF CONTENTS............................................................................i

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT REGARDING ORAL ARGUMENT ........................... viii

JURISDICTIONAL STATEMENT ..........................................................1

STATEMENT OF THE ISSUES...............................................................2

STATEMENT OF THE CASE...................................................................3

    Relevant Procedural History...........................................................3

    Corrections to the Government's Factual Assertions....................12

SUMMARY OF THE ARGUMENT ......................................................19

ARGUMENT:

I.    The District Court Correctly Determined that the Jury's Exposure to Carey Exhibits #3-4 was Structural Error ......................................20

    A.    Standard of Review................................................................22

    B.    The Government Conflates Structural Error and Extraneous Influence....................................................................................22

        1.    Structural Error .................................................................22

        2.    Extraneous Influences and *Remmer* Hearings....................31

        3.    *Bruton* and Confrontation Clause Violations .....................38

C.  The District Court Did not Abuse its Discretion in Finding that the Jury's Exposure to Carey Exhibits #3-4 Amounted to Structural Error ....................................................................39

D.  F.R.A.P. 28(i) Adoption and Incorporation by Reference........44

II.  While no Harmless Errort Analysis is Allowed, the Jury's Exposure to Carey Exhibits #3-4 was Prejudicial..............................45

A.  Standard of Review..................................................................45

B.  Law .......................................................................................47

C.  Mr. Carey did not Confess to his Participation in the Charged Murder-for-Hire Conspiracy, and there was not Overwhelming Admissible Evidence of Mr. Carey's Guilt. ................................................................................48

D.  Mr. Carey was Prejudiced by the Unadmitted Exhibits Being Provided to the Jury. ...................................................51

E.  F.R.A.P. 28(i) Adoption and Incorporation by Reference. .....55

CONCLUSION...................................................................................56

CERTIFICATE OF COMPLIANCE....................................................57

CERTIFICATE OF SERVICE .............................................................58

DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS ..............59

# TABLE OF AUTHORITIES

**CASES:**                                                                                    **PAGE(S):**

*Arizona v. Fulminate,* 499 U.S. 279 (1991)...............................................................23

*Bomar v. Wetzel,* 2024 WL 1485838 (E.D. Pa. Apr. 5, 2024)................................37

*Bruton v. United States,*   391 U.S. 123 (1968).................................... *Passim*

*Chapman v. California,* 386 U.S. 18 (1967).................................................29, 40, 54

*Cunningham v. Shoop,* 23 F.4th 636 (6th Cir. 2022).................................................37

*Dallago v. United States,* 427 F.2d 546 (D.C. Cir. 1969) .......................................33

*Dickson v. Sullivan,* 849 F.2d 403 (9th Cir. 1998) .................................................33

*Erlinger v. United States,* 602 U.S. 821 (2024).......................................................20

*Farese v. United States,* 428 F.2d 178 (5th Cir. 1970)...........................................34

*Fullwood v. Lee,* 852 F.3d 663 (4th Cir. 2002) ......................................................21

*Gentile v. State Bar of Nevada,* 501 U.S. 1030 (1991)...........................................28

*Gibon v. Clanon,* 633 F.2d 851 (9th Cir. 1980)......................................................34

*Gray v. Mississippi,* 481 U.S. 648 (1987)...............................................................29

*Hall v. Zenk,* 692 F.3d 793 (7th Cir. 2012).............................................................47

*Hobson v. Wilson,* 737 F.2d 1 (D.C. Cir. 1984)......................................................46

*Holbrook v. Flynn,* 475 U.S. 560 (1986) ................................................................24

*Holland v. Illinois,* 493 U.S. 474 (1990) ...............................................................30

*In re: Sittenfield,* 49 F.4th 1061 (6th Cir. 2022) ........................................36

*Irvin v. Dowd,* 366 U.S. 717 (1961)..................................................20, 30

*Lawson v. Borg,* 60 F.3d 608 (9th Cir. 1995) .........................................24

*Lutwak v. United States,* 344 U.S. 604 (1953).......................................42

*Mattox v. United States,* 146 U.S. 140 (1892) .......................................33

*Neder v. United States,* 527 U.S. 1 (1999)........................................23, 30

*Owen v. Duckworth,* 727 F.2d 643 (7th Cir. 1984) .................................46

*Owens v. Duncan,* 781 F.3d 360 (7th Cir. 2015)....................................24

*Parker v. Gladden,* 385 U.S. 363 (1966).........................................28, 30

*Pointer v. Texas,* 380 U.S. 400 (1965).............................................21, 53

*Presley v. Georgia,* 558 U.S. 209 (2010).......................................... 25-26

*Remmer v. United States,* 347 U.S. 227 (1954)................................*Passim*

*Riley v. Deeds,* 56 F.3d 117 (9th Cir. 1995) ..........................................27

*Rodriguez v. Marshall,* 125 F.3d 739 (9th Cir. 1997) ............................33

*Rushen v. Spain,* 464 U.S. 114 (1983)...............................................32, 33

*Skilling v. United States,* 130 U.S. 2896 (2010) ....................................24

*Stanford v. Parker,* 266 F.3d 442 (6th Cir. 2001)...................................48

*State v. Anderson,* 598 A.2d 229 (1991).................................................34

*Stockton v. Virginia,* 852 F.2d 740 (4th Cir. 1988) ................................20

*Tanner v. United States,* 483 U.S. 107 (1987)........................................................32

*Turner v. Louisiana,* 379 U.S. 466 (1965).....................................................4, 21, 28

*Tumey v. Ohio,* 273 U.S. 510 (1927) ........................................................29

*United States v. Adams,* 385 F.2d 548 (2nd Cir. 1967) ...........................................34

*United States v. Bagnariol,* 65 F.2d 877 (9th Cir. 1981)........................................33

*United States v. Barnes,* 747 F.2d 246 (4th Cir. 1984)..........................................33

*United States v. Butler,* 822 F.2d 1191 (D.C. Cir. 1987)........................................46

*United States v. Campbell,* 122 F.4th 624 (6th Cir. 2024) .....................................47

*United States v. Canthadra,* 230 F.3d 1237 (10th Cir. 2000)..................................36

*United States v. Cope,* 312 F.3d 757 (6th Cir. 2002)................................................54

*United States v. Delaney,* 732 F.2d 639 (8th Cir. 1984)..........................................46

*United States v. Dutkel,* 192 F.3d 893 (9th Cir. 1999) ....................................... 36-37

*United States v. Gonzalez,* 227F.3d 140 (6th Cir. 2000) ........................................32

*United States v. Gonzalez-Lopez,* 548 U.S. 140 (2006)..........................................43

*United States v. Hans,* 738 F.2d 88 (3rd Cir. 1984) ................................................34

*United States v. Hines,* 696 F.2d 722 (10th Cir. 1982)...........................................46

*United States v. Howard,* 506 F.2d 865 (5th Cir. 1975)..........................................34

*United States v. Kechego,* 91 F.4th 845 (6th Cir. 2024)..........................................36

*United States v. Lanier,* 988 F.3d 284 (6th Cir. 2021) .....................................37, 47

*United States v. Lentz,* 383 F.3d 191 (4th Cir. 2004) ...............................................33

*United States v. Littlefield,* 752 F.2d 1429 (9th Cir. 1985) ....................................46

*United States v. Luffred,* 911 F.2d 1011 (5th Cir. 1990) .........................................34

*United States v. Lundy,* 83 F.4th 15 (6th Cir. 2023) ................................................39

*United States v. Munoz,* 605 F.3d 359 (6th Cir. 2010) ............................................22

*United States v. Noushfar,* 78 F.3d 1442 (9th Cir. 1996) .................................. 27-28

*United States v. Olano,* 507 U.S. 725 (1993) .....................................................36, 46

*United States v. Pennell,* 737 F.2d 521 (6th Cir. 1984)...........................................46

*United States v. Ronda,* 455 F.3d 1273 (11th Cir. 2006)..........................................46

*United States v. Sababu,* 891 F.2d 1308 (7th Cir. 1989) .................................... 37-38

*United States v. Smith,* 354 F.3d 390 (5th Cir. 2003) ........................................ 35-36

*United States v. Tejada,* 481 F.3d 39 (1st Cir. 2007) ...............................................36

*United States v. Warner,* 498 F.3d 666 (7th Cir. 2007)...........................................37

*United States v. Webster,* 750 F.2d 307 (5th Cir. 1984)..........................................46

*United States v. Williams,* 809 F.2d 75 (1st Cir. 1986) ...........................................46

*United States v. Winston,* 55 F. App'x 289 (6th Cir. 2003)....................................48

*Vasquez v. Hillery,* 474 U.S. 254 (1986) ........................................................... 29-30

*Waller v. Georgia,* 467 U.S. 39 (1984)................................................................ 24-25

*Weaver v. Massachusetts,* 582 U.S. 286 (2017) ..........................................21, 23, 40

*White v. Maryland,* 373 U.S. 59 (1963)....................................................................24

*Williams v. State,* 448 So.2d 49 (Fla.Ct.App. 1984).................................................34

**STATUTES:**

18 U.S.C. § 924 ...........................................................................................................3

18 U.S.C. § 1201 .........................................................................................................3

18 U.S.C. § 1958 .........................................................................................................3

18 U.S.C. § 3231 .........................................................................................................1

18 U.S.C. § 3731 .........................................................................................................1

**UNITED STATES CONSTITUTION:**

U.S. Const. Amend. VI ...............................................................................................20

**RULES:**

Federal Rule of Appellate Procedure 28(i) .........................................................44, 55

Federal Rule of Appellate Procedure 32 ...................................................................57

Federal Rule of Criminal Procedure 29 ....................................................................12

Federal Rule of Criminal Procedure 33 .........................................................12, 19, 22

Federal Rule of Evidence 606(b) ...............................................................................32

Sixth Circuit Rule 30...................................................................................................59

**OTHER:**

Letter from Clarendon to W. Pym (Jan. 27, 1766), *reprinted in Papers of John Adams* 169 (R. Taylor ed. 1977)...........................................................................................20

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Defendant-Appellee Carey defers to this Court's sound judgment as to whether the facts and legal arguments are adequately presented in the briefs to make oral argument unnecessary in this case involving the extremely rare grant of a criminal defendant's motion for new trial.

## <u>JURISDICTIONAL STATEMENT</u>

The United States District Court for the Middle District of Tennessee had subject matter jurisdiction over the criminal prosecution of Defendant-Appellee Carey pursuant to 18 U.S.C. § 3231.

On September 17, 2024, the district court issued a Memorandum and Order granting Mr. Carey's motion for a new trial on his counts of conviction. (Memorandum and Order, R. 561, #6388).[1]  The government filed a timely notice of appeal on October 15, 2024.  (Notice of Appeal, R. 565, #6425).  This Court has jurisdiction under 18 U.S.C. § 3731.

.

---

1   This brief cites documents from Case No. 3:21-cr-00288 using the form "[Document Description], R. __, #[Page I.D. #]," and it cites documents from Case No. 24-5932 using the form "[Document Description], AR. __, p.[Page:   ].

1

## <u>STATEMENT OF THE ISSUES</u>

I.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN CONCLUDUNG THAT THE JURY'S EXPOSURE TO CAREY EXHIBITS #3-4 WAS STRUCTURAL ERROR.

II.    WHILE NO HARMLESS ERROR ANALYSIS IS ALLOWED, THE JURY'S EXPOSURE TO CAREY EXHIBITS #3-4 WAS PREJUDICIAL.

## STATEMENT OF THE CASE

### I.    Relevant Procedural History

On November 29, 2021, a panel of the federal grand jury sitting in the Middle District of Tennessee returned a three count Indictment charging Mr. Carey, with: conspiracy to commit kidnapping and substantive kidnapping with death resulting, in violation of 18 U.S.C. § 1201(a) and (c), and with discharging a firearm during and in relation to crime of violence, in violation of 18 U.S.C. § 924(c) & (j). (Indictment, R. 3, #58).    Mr. Carey was arrested on December 10, 2021, at his home in North Carolina and first appeared in the Middle District of Tennessee on January 28, 2022.    (Minute Entry, R. 57, #285).    Mr. Carey was detained pending trial and remains detained to date.    (Order of Detention, R. 60, #288).

On July 25, 2022, a panel of the federal grand jury sitting in the Middle District of Tennessee returned a three count Superseding Indictment charging Mr. Carey with conspiracy to commit murder-for-hire resulting in death, in violation of 18 U.S.C. § 1958 (Count One); conspiracy to commit kidnapping resulting in death, in violation of 18 U.S.C. §§ 1201(a) and (c) (Count Two); and with kidnapping resulting in death, in violation of 18 U.S.C. § 1201(a)(1) and 2 (Count Three). (Superseding Indictment, R. 127, #516).

On July 31, 2022, Mr. Carey moved to be severed from his co-defendants

3

based in-part on the antagonistic defenses that would be presented at a joint trial, and because all of Mr. Carey's co-defendants had given statements to the government, or a government informant, accusing Adam Carey of committing some of the crimes alleged in the Superseding Indictment.   (Carey Motion to Sever, R. 137).   These recorded statements are now directly at issue in this appeal.   On September 7, 2022, the district court denied Mr. Carey's Motion, finding that redaction of the recordings and a limiting instruction would cure any *Bruton* concerns.   (Severance Memorandum and Order, R. 176).   That clearly did not turn out to be the case.

On December 12, 2022, Gilad Peled, who had been assisting the government in attempting to ensnare Mr. Carey in the alleged conspiracy since his arrest on December 10, 2021, entered into a cooperation agreement with the government and pleaded guilty (Sealed Order Accepting Plea Petition and Agreement, R. 211).

On January 16, 2023, Mr. Carey filed a motion in limine, citing *Turner v. Louisiana*, 379 U.S. 466, 85 S.Ct. 546 (1965), requesting that the district court prohibit the display or presentation of any exhibits to the jury until such items were properly admitted pursuant to the Federal Rules of Evidence.   (Carey MIL #4, R.235).   On January 18, 2023, due to a continuance of the trial, this motion was denied without prejudice to refile.   (Order Continuing Trial, R. 244).   On August, 28, 2023, Mr. Carey refiled the same motion.   (Carey MIL #4, R.286).   Mr. Carey's

motion was not opposed by the government.

On August 29, 2023, Mr. Carey filed a motion in limine seeking to exclude the jury being exposed to clips of the government controlled recordings between David Conaway and Brian Brockway because they were post-conspiracy hearsay, would not be admissible if Mr. Carey were tried alone, and raised *Bruton* concerns at a joint trial.   (Carey MIL #8, R.299).   Also on August 29, 2023, Mr. Carey filed a motion in limine seeking to exclude the recording of the FBI's ruse telephone call between Mr. Maund and Mr. Peled for the same reasons.   (Carey MIL #9, R.300).

On September 12, 2023, the government responded to Mr. Carey's Motions in Limine #8 and #9 by stating that the recordings at issue are only admissible at Mr. Carey's trial because it was a joint trial and Mr. Brockway and Mr. Maund would be "party opponents" at that trial.   The government further argued that any *Bruton* concerns could be easily cured with redactions and limiting instructions. (Government's Response to MIL #8-9, R.321).   On September 19, 2023, Mr. Carey filed a reply arguing that:

> The government's Response indicates that it intends to introduce all of the recordings at issue ("Recordings" hereafter) as statements by party opponents under Rule 801(d)(2)(A) of the Federal Rules of Evidence. The government concedes that the Recordings are not co-conspirator statements, and it does not raise any other rule of evidence that would make the Recordings admissible at Mr. Carey's trial.
>
> It is undisputed that the Recordings are deliberately scripted and/or

5

controlled by law enforcement. They simply would not exist without the fabrication of pretenses and manipulation by law enforcement. Mr. Carey is not a party to the Recordings and did not know of their contents until they were disclosed in the discovery materials. Those who are actually parties to the Recordings directly incriminate him, even with lies provided by law enforcement. The government's almost gleeful Response that it is allowed to use the Recordings it created at Mr. Carey's trial, when they would otherwise be inadmissible, is yet another example of why Mr. Carey will not receive a fundamentally fair trial if seated next to Messrs. Maund and Brockway.

(Carey Reply, R. 330).

On September 25, 2023, Mr. Carey filed a motion requesting that the district court reconsider severing Mr. Carey based upon the developments (antagonistic defenses, the government's ability to admit the prejudicial recordings only at a joint trial, etc.) as the trial approached that did not exist, or weren't as blatant, when the district court previously ruled. (Carey Motion to Reconsider, R. 334).

On October 19, 2023, the district court entered a succinct Order prohibiting the display or presentation of any exhibits to the jury until such items were properly admitted pursuant to the Federal Rules of Evidence, but allowing the ruse, "party-opponent" recording between Maund and Peled. (MIL Order, R. 367). On October 24, 2023, the district court denied Mr. Carey's request that it reconsider its prior severance ruling. (Reconsideration Order, R. 383). On October 25, 2023, the district Court ruled that the law enforcement controlled, ruse, "party-opponent" recordings between Brockway and Conaway were allowed into evidence, and that

6

redactions and a limiting instruction would cure any *Bruton* issues.  (Recordings Order, R. 385).   Again, this was clearly not the case.

Over his many objections, Mr. Carey proceeded to a joint trial with Mr. Maund and Mr. Brockway on November 1, 2023.   (Minutes, R. 393, #2275).   The joint trial was literally littered with instances where Mr. Carey's primary adversary was not the government, but his co-defendants.   Just a very few examples are:

Court - It was your motion. Now you've got –

Perry - Basically, we're going to be prosecuted by the co-defendant, is the issue here, which we've brought up.

Evans - Right. And I didn't file the motion. I got the same notice. I think it's fair game because my client didn't say it. And where we're standing right now, no pun intended, but shots fired, you know, between defendants.

Court -: I get it.

(Trial Transcript, R. 457, #3250)

Perry - Well, Your Honor, I guess I need to know whether or not -- you know, if it affects what I present whether or not it opens the door. I don't see how -- temporally, you know, that's a July 2021 conversation. You know, what -- what they're talking about in context here –

Basset - Actually, the lunch is in July of '20 -- sorry, the conversation.

Perry - Because if the Court's going to rule that I opened the door, then I may not advance that.

Bassett - Mr. Maund's team concurs with Mr. Evans's position.

Perry - Of course.

7

(Trial Transcript, R. 461, #4111)

> Court - I mean, I think that would make relevant that I've kept out from the government and you putting that in would make that relevant.
>
> Perry - I guess I don't follow.
>
> Court - I guess you're in a bit of a Hobson's choice.
>
> Perry - The decision -- that's a choice that's forced on us because we're in a joint trial, just for the record.
>
> Court - Believe me, your severance motion is well-preserved.

(Trial Transcript, R. 461, #4112)

Given the district court's pretrial rulings and constant prosecution by his co-defendants, Mr. Carey was forced to make several offers of proof during the trial in order to create a record, in the event of an appeal.   One of which led which to Carey Exhibits #3-4 being marked for identification, but not entered into evidence.   (*Id. at* #4282-4284).

To even further highlight the antagonism and prosecution that Mr. Carey received from his co-defendants, counsel for Mr. Maund literally concluded his closing argument with a parting shot at Mr. Carey:

> Minton:   …Now, let's talk about the fact that Erik Maund clearly says to take out Adam Carey. He's not indicted for that.   That is not before you.   And I will tell you -- and I probably shouldn't say it here in front of God and country and law enforcement -- if I knew that -- and Adam Carey was out there that knew about me, my family, and where I live, ladies and gentlemen, I'm pretty sure what I would do.   I'm pretty sure what I would do. And this one hits.

(Trial Statement, R. 454, #2831).    Mr. Carey promptly moved for a mistrial, and the district court denied the request.    (*Id*. at #2838).    On November 17, 2023, the jury convicted Mr. Carey on all counts.    (Carey Redacted Verdict Form, R. 441, #2699).

After the trial (prior to Mr. Carey filing a motion pursuant to Rule 29 and Rule 33), the district court clerk "received a number of requests for trial exhibits from the media." (Memorandum and Order, R. 561, #6391).    While gathering the requested exhibits, the clerk discovered various "discrepancies between the exhibit list prepared during trial and exhibits provided to the jury." (*Id*.) The district court informed the parties of the discrepancies at a January 29, 2024, hearing.    (*Id*.)    Mr. Carey responded to the court's disclosure by filing a Rule 33 motion for a new trial. (Carey Sealed Motion for New Trial, R. 496).

Mr. Carey argued that the court's erroneous submission of unadmitted exhibits to the jury amounted to structural error that mandated vacatur of their convictions and a new trial (without a *Remmer* hearing), and that the jury's exposure to inadmissible evidence—specifically, Carey Exhibits #3-4—was an error that "undermined one of the most fundamental tenets of our justice system: that a defendant's conviction may be based only on the evidence presented during trial." (*Id*.).    Mr. Carey further claimed that any *Remmer* hearing would be constitutionally inadequate, "given the circumstances surrounding the evidence at issue, the time that

9

had passed since the trial, posttrial publicity by the government, and the restrictions on inquiry into jury deliberations imposed by Fed. R. Evid. 606.  (Memorandum and Order, R. 561, #6393).   Finally, Mr. Carey claimed that the jury's exposure to Carey Exhibits #3 4 also violated *Bruton* and his Sixth Amendment right to confrontation.   (Carey Sealed Motion for New Trial, R. 496).

Despite Mr. Carey's position that a *Remmer* hearing was both unnecessary and inadequate, on May 15, 2024, the district court held a *Remmer* hearing at which the jurors were called to testify.   (Memorandum and Order, R. 561, #6403). Approximately two months after post-hearing briefing by the parties concluded, the district court detailed the issues, mistakes and testimony from the hearing in its Memorandum and Order.   (Memorandum and Order, R. 561, #6403-6411).

The district court then made the following, undisputed, factual findings regarding the jurors' exposure to Carey Exhibits #3-4:

> [T]he Court concludes that at least one of the jurors reviewed the unredacted transcript of the excerpt of the recording of the October 25, 2021 meeting between Brockway and Conaway, which was Carey Exhibit 4. It is also likely that jurors listened to the unredacted recording. Two jurors recognized the appearance of the USB drive that was Carey Exhibit 3 and one juror said that it was used to play a recording. If that juror's recollection is accurate, it would have exposed all of the jurors to the unredacted recording.

(*Id.* at #6411).   Then, the district court carefully analyzed the relevant law as applied to the facts at hand and held that "…the errors in presenting certain exhibits to the

10

jury constitute structural error." (Memorandum and Order, R. 561, #6416.).   At that point, no "harmless error" consideration was required or allowed.

The government is clearly unhappy with that result and blames the district court for not engaging in harmless error analysis.   In pushing its agenda, the government goes so far as to claim that "The court clarified that "[h]ad the same circumstances occurred without Brockway or Maund stating what they would do if Carey sought to admit his Exhibit 3," then its error *would* have been subject to harmless-error review. (*Id.* at #6418).   (Opening Brief, AR. 25, p.41, *emphasis* in the original).   When, in fact, the district court, during its thorough analysis, actually wrote "Had the same circumstances occurred without Brockway or Maund stating what they would do if Carey sought to admit his Exhibit 3, then giving Exhibit 3 to the jury **may** have fallen under the "harmless-error" standard…"  (Memorandum and Order, R. 561, #6418 **emphasis**  added).

The record is clear that, based upon its sound, and unchallenged, factual findings and correct application of the relevant law, the district court properly granted Mr. Carey's motion for a new trial, and did not abuse its discretion. Unsatisfied with the district court's decision, the government filed a timely notice of appeal on October 15, 2024.   (Notice of Appeal, R. 565, #6425).

## II.    Corrections to the Government's Factual Assertions

As this appeal involves Rule 33 rather than a Rule 29, the government is not entitled to cherry-pick snippets of the evidence and have it viewed in the light most favorable to it.   The vast majority of the factual assertions in the government's Opening Brief are irrelevant to this appeal.    However, some of the inaccuracies and misleading statements must be addressed.    Repeatedly, and presumably intentionally, the government lumps Mr. Carey into allegations about other individuals.   In an attempt at efficiency, Mr. Carey will address some, but not all of, the matters as they appear chronologically in the Opening Brief.

At Opening Brief, AR. 25, p.16, the government claims that Conaway and Repinski were concerned about "Carey's "insinuation that he would . . . murder" Williams or Lanway for $50,000 or $60,000…"   When David Conaway's testimony is viewed in its entirety, Mr. Conaway testifies that the uncorroborated statement allegedly attributed to Adam Carey was "rather vague" and thus required his interpretation.    (Trial Transcript, R. 460, #4003).    Notably, Mr. Conaway's "interpretation" only evolved after he was actively engaged in cooperating with and working for the FBI.

At Opening Brief, AR. 25, p.17, the government claims that "Carey also carried a .22 pistol with him to Nashville."    The record actually reflects that no one

12

saw Adam Carey with a .22 pistol in Nashville.   FBI informant David Conaway's

uncorroborated testimony was only that Adam Carey allegedly told him that he had

a .22 pistol.   (Trial Transcript, R. 460, #4012).   In fact, FBI SA Som testified that

he told Mr. Conaway about a .22 being involved in the murders before Mr. Conaway

made any allegations of uncorroborated conversations with Mr. Carey or about a .22

pistol.

> Perry - And after that, you're the one that interjected -- you told him about there being a .22 involved in this; right?

> Som - Yes, sir.

> Perry - Okay. And you're the one that told him you knew that there were contacts with Adam Carey after the event; right?

> Som - Yes, sir.

> Perry - And then after you had front-loaded that information, that's when you threatened him with the death penalty; right?

> Som - Yes.

> Perry - Then his story changed; right?

> Som - Yes, sir.

> Perry - And he began matching your theory with what he's telling you; right?

> Som - I can't presume to know what he's thinking at the time. My belief is that he was being truthful.

> Perry - But it changed to give you the information you wanted; right?

13

Som - I wouldn't say that.

Perry - Okay. And not to beat a dead horse, but that's your technique, isn't it? You give these individuals that you interrogate information, threaten them, and then you get that information fed back to you; is that right?

Som - It can be. It's one of my techniques.

Perry - It is in this case, in the two examples of Mr. Peled and Mr. Conaway; right?

Som - Yes, sir.

(Trial Transcript, R. 460, #3931-3932).

At Opening Brief, AR. 25, p.18, the government claims that "At this point, Brockway explained that he and Carey should also murder Williams, given their belief that she too was involved in the plot to extort Maund."   There is simply no evidence or testimony in the record that Gil Peled was ever aware of Adam Carey's name or existence prior to the murders.   His sole point of contact was Mr. Brockway.

At Opening Brief, AR. 25, p.18, FN 5, the government claims that "…Brockway and Carey had already agreed to murder Lanway for just $120,000." Again, there is simply no evidence or testimony in the record that Gil Peled was ever aware of Adam Carey or that Adam Carey agreed to anything other than a surveillance job prior to the murders.

At Opening Brief, AR. 25, p.19, the government claims that "The surveillance

14

system then captured the sound of "[g]unshots, banging[,] and screaming" in the parking lot."   While that may be an interpretation of the audio, FBI SA Som testified that the video was actually a compilation that had been spliced together wholly by law enforcement.

> Perry - Okay. And you're familiar with the clip that's been played from the night of March 12th; is that right?
>
> Som - Yes, sir.
>
> Perry - And that's a long clip; right?
>
> Som - Yes, sir.
>
> Perry - And that is actually a combination of other clips; is that accurate?
>
> Dom- Yes, it is.
>
> Perry - And that combination was created by law enforcement; is that right?
>
> Som - Yes, sir, MNPD.

(Trial Transcript, R. 460, #3931-3932).

At Opening Brief, AR. 25, p.19-20, the government lists many nefarious actions and asserts that those are supposedly "As they explained in subsequent admissions, Brockway and Carey…"   Mr. Carey again finds himself in the unenviable situation of having to prove a negative, but the record is clear that absolutely none of the conduct or actions in Opening Brief, AR. 25, p.19-20 was ever admitted to by Mr. Carey.

15

Further, in Opening Brief, AR. 25, p.20, the government claims that "In the days after Williams's and Lanway's murders, the defendants and Peled got "rid" of their cellphones."   This is misleading at best, because Agent Som testified that Mr. Carey had actually kept and transferred all of his historical data to his new phone.

> Perry - Now, in your investigation, Mr. Carey didn't disable any of his Find My phone features; is that accurate?
>
> Som - Not that I saw. I need to look at the features itself.
>
> Perry - But you don't know that he did; correct?
>
> Som - I don't know if he did or did not.
>
> Perry - And you were able -- he didn't delete his iCloud?
>
> Som   That's correct. It appears his iCloud was downloaded onto the new phone, his iPhone.
>
> Perry - He kept his data; is that right?
>
> Som - It appears his original data was on the new phone, yes.

(Trial Transcript, R. 460, #3921).

At Opening Brief, AR. 25, p.23, the government claims that "Conaway maintained that he was not involved in the conspiracy to murder Williams and Lanway, but he told the FBI that Carey had conveyed to him in a March 2020 phone call that he and Brockway had, in fact, murdered Williams and Lanway."   However, as quoted *infra.*, Agent Som testified that he had actually "front-loaded" Mr.

16

Conaway with that information before Mr. Conaway concocted the uncorroborated conversation with Mr. Carey.

At Opening Brief, AR. 25, p.24, the government claims that "the FBI directed Conaway to "use a ruse" and tell Brockway and Carey that he was contacting them about another murder-for-hire job that "was similar to the one in Nashville."  This is again misleading.  Agent Som concocted a ruse based upon his theory about what took place in Nashville and fed that to Mr. Conaway (Trial Transcript, R. 459, #3665), and then Mr. Conaway dutifully performed as directed (Trial Transcript, R. 460, #4035).  However, nowhere in the record, even on the recordings, does Mr. Carey discuss anything "similar to the one in Nashville" as the government infers.

At Opening Brief, AR. 25, p.24, the government claims that "In subsequent recorded conversations with Conaway, both Brockway and Carey agreed to join the fictional murder-for-hire scheme proposed by Conaway (Trial Transcript, R. 459, #3665), and they made several incriminating statements about Williams's and Lanway's murders. (*Id.* at #3665-66)."  In no recorded conversation did Adam Carey ever agree to join the fictional murder-for hire scheme, nor did he make any incriminating statements about the murders.  Notably, Mr. Conaway didn't testify to that, and Agent's Som's one- or two-word testimony to that effect is mistaken. A simple review of the recordings will verify that.

Finally, chronologically, at Opening Brief, AR. 25, p.32, the government claims that "The jury also saw evidence of cellphone location data that placed Carey around the dump site on the day of the murders…"   However, FBI CAST Agent Rexing clearly testified that Mr. Carey's phone data didn't necessarily place his phone "around the dump site."

Perry - So it could be anywhere in this area; right?

Rexing   It could, yes.

Perry - It could be at this commercial area down here where McDonald's and gas stations are; right?

Rexing - It could, yes.

Perry - Okay. And there's no data that you reviewed that, during this 11:37 a.m. contact, that the device was anywhere in proximity to that 497 Old Hickory Boulevard, is there?

Rexing - I only know the tower that was utilized at that time.

Perry - Okay. I believe you said you can't say that it was close to any particular location at all, can you?

Rexing - That's correct.

Perry - And, I mean, to do so would be deceptive, wouldn't it?

Rexing - It would, yes.

(Trial Transcript, R. 463, 4529).

# SUMMARY OF THE ARGUMENT

While granting a criminal defendant a new trial pursuant to Rule 33 falls within the discretion of every single district court judge, it is exceedingly rare for any district court to exercise that discretion.   Certainly, if the evidence were truly as "overwhelming" as the government incessantly claims, the district court could have simply ruled that there was no structural error, and that any error was harmless. Instead, the district court painstakingly undertook its duty under Rule 33 and granted Mr. Carey a new trial.

The district court did not clearly and manifestly abuse its discretion in finding that its error in exposing the jury to Carey Exhibits #3-4 was a structural one.   The district court's error was not a textbook case of an extraneous influence or a simple *Bruton* error, and, once the structural error determination was made, there is no binding precedent that required the district court to then go forward and attempt to assess the purely speculative impact of its error.

Given the multi-faceted facts surrounding the error, the district court, who had the benefit of personally observing every aspect of this trial, took approximately two months to carefully consider the facts and cautiously apply the relevant law before issuing a well-reasoned 32-page opinion granting Mr. Carey a new trial. Respectfully, this Court should not substitute its judgment for that of the trial judge.

**ARGUMENT**

**I.**     THE DISTRICT COURT CORRECTLY CONCLUDED THAT THE JURY'S EXPOSURE TO CAREY EXHIBITS #3-4 WAS STRUCTURAL ERROR.

At our nation's founding, the right to a trial by jury was, along with representative government, considered "the heart and lungs" of liberty.   Letter from Clarendon to W. Pym (Jan. 27, 1766), *reprinted in Papers of John Adams* 169 (R. Taylor ed. 1977).   This right was paramount to the Framers and chief among the protections afforded by state constitutions.   *See Erlinger v. United States*, 602 U.S. 821, 829–30 (2024) (citations omitted). James Madison, who drafted the Bill of Rights, "described protections for the jury trial right as among 'the most valuable' that appear in 'the whole list.'"   *Id*. at 830 (citing Annals of Cong. 755 (1789)).

The Sixth Amendment and due process under the Fourteenth Amendment guarantee a criminal defendant the right to a trial by an impartial jury.   U.S. Const. amend. VI; *Irvin v. Dowd*, 366 U.S. 717, 722 (1961).   "No right touches more the heart of fairness in a trial."   *Stockton v. Virginia*, 852 F.2d 740, 743 (4th Cir. 1988). The Supreme Court has long held that "[t]he requirement that a jury's verdict 'must be based upon the evidence developed at the trial' goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury," and that the Constitution requires "at the very least that the 'evidence developed' against a

defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." *Turner v. Louisiana*, 379 U.S. 466, 472-73 (1965); *see also Pointer v. Texas*, 380 U.S. 400, 405 (1965)("There are few subjects, perhaps, upon which this Court and other courts have been more nearly unanimous than in their expressions of belief that the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal.").

The jury's consideration of evidence provided to it by the district court, but not properly admitted at trial, violates the Sixth Amendment (*See e.g., Fullwood v. Lee*, 290 F.3d 663, 682 (4th Cir. 2002)(quoting *Irvin v. Dowd*, 366 U.S. 717, 722 (1961)) and undermines the fundamental fairness of a criminal trial. "The purpose of the structural error doctrine is to ensure insistence on certain basic, constitutional guarantees that should define the framework of any criminal trial." *Weaver v. Massachusetts*, 582 U.S. 286, 294–95, 137 S. Ct. 1899, 1907, 198 L. Ed. 2d 420 (2017).

The government's position is that it is perfectly acceptable for unadmitted exhibits to be sent to the jury deliberation room by a trial court. However, the district court correctly accepted responsibility, determined that its error in providing

21

the jury with Carey Exhibits #3-4, with the apparent imprimatur of the court, violated the basic constitutional guarantees for the framework of a criminal trial, and, as such, constituted structural error. This Court should therefore affirm the district court's order granting Mr. Carey a new trial and remand this case to the district court for trial.

### A.    Standard of Review

This Court "review[s] a district court's decision to grant a Rule 33 motion" for a new trial "for abuse of discretion." *United States v. Munoz*, 605 F.3d 359, 366 (6th Cir. 2010). The government's hurdle is high because Rule 33 provides that "[u]pon the defendant's motion, [a district] court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed.R.Crim.P. 33(a). The rule "does not define 'interest[ ] of justice' and the courts have had little success in trying to generalize its meaning." Furthermore, it is widely agreed that Rule 33's "interest of justice" standard allows the grant of a new trial where substantial legal error has occurred. *Id* at 373 (citing *United States v. Kuzniar,* 881 F.2d 466, 470 (7th Cir.1989 and *United States v. Wall,* 389 F.3d 457, 474 (5th Cir.2004).

### B.    The Government Conflates Structural Error and Extraneous Influence.

#### 1. *Structural Error*

The government is correct that errors that "affect the framework within which

22

the trial proceeds" constitute structural errors that cannot be deemed harmless and require the automatic vacatur of a defendant's conviction.  *Weaver v. Massachusetts*, 582 U.S. 286, 295 (2017) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991)).  The government is also correct that the Supreme Court has applied the structural error doctrine to "a very limited class of cases" and that "an error is either structural or it is not."  *Neder v. United States*, 527 U.S. 1, 8-14 (1999).

It should be expected that an error of this magnitude is rare, given the structural protections of a criminal trial.  Likewise, it should also not be surprising that there is scant appellate caselaw that is factually on point.  The Supreme Court has not yet held that an egregious error like that in the instant case is structural, but it is equally true that the Court has not held that it is not structural.  However, the Supreme Court has held that structural errors are errors that deprive defendants of "basic protections" without which "a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence ... and no criminal punishment may be regarded as fundamentally fair."  *Id.* at 8-9, quoting *Rose v. Clark*, 478 U.S. 577-578.

One of the most basic protections for defendants is the framework within which trials proceed wherein the jury must decide the case based on admissible

23

evidence - and only admissible evidence.  "Jury exposure to facts not in evidence deprives a defendant of the rights to confrontation, cross-examination and assistance of counsel embodied in the Sixth Amendment." *Lawson v. Borg*, 60 F.3d 608, 612 (9th Cir. 1995).  "One accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial," *Holbrook v. Flynn*, 475 U.S. 560, 567 (1986), quoting *Taylor v. Kentucky*, 436 U.S. 478, 485 (1978).  "The presumption [of innocence] is violated . . . when the jury is encouraged (or allowed) to consider facts which have not been received in evidence".  *Owens v. Duncan*, 781 F.3d 360, 362 (7th Cir. 2015), quoting *United States v. Garcia*, 439 F.3d 363, 366-68 (7th Cir. 2006).  "The theory of our trial system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print." *Skilling v. United States*, 130 S. Ct. 2896, 2913 (2010) (quotation omitted).

While there appear to be no cases that are directly factually on point, there are several cases where presumptively less egregious incidents have been determined to be structural error.  In *White v. Maryland*, 373 U.S. 59 (1963) a conviction was set aside because the defendant had not had counsel at a preliminary hearing without regard to the showing of prejudice.  In *Waller v. Georgia*, 467 U.S. 39, 49, n. 9

24

(1984), the Supreme Court determined that simply closing a suppression hearing to the public constituted structural error.

If the right to a public pretrial motion hearing, as in *Waller*, is important enough to be classified as structural error, the right for each party to ensure that admissible evidence is given to the jury and inadmissible evidence is excluded is just as fundamental – even more so. The error in Mr. Carey's case undermines one of the most fundamental tenets of our justice system: that every defendant's conviction may be based only on the evidence presented during the trial.

In *Presley v. Georgia*, 558 U.S. 209 (2010), the trial judge noticed a single observer, Presley's uncle, in the courtroom as jury selection was about to begin and asked him to return later:

> Well, you still can't sit out in the audience with the jurors. You know, most of the afternoon actually we're going to be picking a jury. And we may have a couple of pre-trial matters, so you're welcome to come in after we ... complete selecting the jury this afternoon. But, otherwise, you would have to leave the sixth floor, because jurors will be all out in the hallway in a few moments. That applies to everybody who's got a case.

*Id*. at 210 (internal citations omitted).

Presley's counsel objected to the exclusion of the public from the courtroom but the court explained, "[t]here just isn't space for them to sit in the audience." When Presley's counsel requested some accommodation, the judge explained his

ruling:

> Well, the uncle can certainly come back in once the trial starts. There's no, really no need for the uncle to be present during jury selection.... [W]e have 42 jurors coming up. Each of those rows will be occupied by jurors. And his uncle cannot sit and intermingle with members of the jury panel. But, when the trial starts, the opening statements and other matters, he can certainly come back into the courtroom.

*Id.* at 210 (internal citations omitted).

After Presley was convicted, he moved for a new trial based on the exclusion of the public from voir dire.   At a hearing, the trial judge denied his motion because "[i]t's totally up to my discretion whether or not I want family members in the courtroom to intermingle with the jurors and sit directly behind the jurors where they might overhear some inadvertent comment or conversation."   *Id.* at 211 (internal citations omitted).   On appeal, the Court of Appeals of Georgia agreed, as did the Supreme Court of Georgia.

While the United States Supreme Court did not use the precise verbiage of "structural error" in its reversal, *Presley* is recognized as an example of structural error.   There was no need for harm analysis.   There was no balancing test to determine whether Presley's uncle's attendance at voir dire would have changed the outcome of the proceedings.   Instead, the Supreme Court reasoned that "the process of juror selection is itself a matter of importance, not simply to the adversaries but to the criminal justice system" and "[t]he public has a right to be present whether or

26

not any party has asserted the right." *Id*. at 214.

In *Riley v. Deeds*, 56 F.3d 1117, 1121 (9th Cir.1995), the Ninth Circuit found structural error when an audiotape was replayed in court without the judge present and with his clerk "presiding." Structural error analysis was the correct approach where there was a "complete abdication of judicial control over the process. In this structural vacuum, a rule requiring the defendant to show prejudice, or one requiring the state to show lack of prejudice, makes no sense." *Id*.

There is a single Circuit case that is virtually on point.[2] In *United States v. Noushfar*, 78 F.3d 1442 (9th Cir. 1996), the defendants were convicted of conspiring to smuggle Persian rugs into the United States. During the undercover investigation that led to the defendants' arrests, customs agents recorded many potentially incriminating conversations with the defendants. *Id*. at 1444. The trial court allowed the jury to take with them to the jury room fourteen tapes that had not been played in open court during the defendants' trial. *Id*. The jurors subsequently requested and were provided with a tape recorder. *Id*. On appeal, in finding that the trial court had erred, the Ninth Circuit stated, "[T]his error undermines one of the most fundamental tenets of our justice system: that a defendant's conviction may

---

2   Although the tapes in *Noushfar* appear to have been admitted into evidence, just not played in open court before being sent to the jury.

27

be based only on the evidence presented during the trial.   Sending the tapes to the jury room is akin to allowing a new witness to testify privately, without cross-examination, to the jury during its deliberations." *Id.* at 1445.   The court reversed the defendants' convictions, describing the error as a "structural." *Id.* "Sending unplayed tapes to the jury room is such a defect.   It violates the basic framework of the trial system, which requires that evidence be presented and tested in front of the jury, judge and defendant." *Id.*

The Ninth Circuit's decision in *Noushfar* finds more than ample support in Supreme Court case law.   "Few, if any, interests under the Constitution are more fundamental than the right to a fair trial by "impartial" jurors, and an outcome affected by extrajudicial statements would violate that fundamental right." *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1075 (1991)(plurality opinion)(citing *Sheppard v. Maxwell*, 384 U.S. 333, 350–51 (1965)).   The Supreme Court has long held that "the evidence developed against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right to confrontation, of cross-examination, and of counsel." *Parker v. Gladden*, 385 U.S. 363, 364–65 (1966); see also, *Turner v. Louisiana*, 379 U.S. 466, 472–73 (1965).

The error in Mr. Carey's case affects a far greater structural defect than in

*Noushfar, Riley, Presley*, *Waller, or White*.    A criminal trial is governed by evidence.   When the court admits evidence, the parties rely that the jury will be provided this evidence.   When the court refuses to admit evidence, the parties rely that this evidence will not be provided to the jury.   Evidence is the foundation of every trial, and the reliability of the authenticity and admissibility and exclusion of evidence is what affords the justice system it's fundamental integrity.

Further, the Supreme Court's statements have suggested, but never squarely held, that a trial court commits structural error if it violates a defendant's Sixth Amendment right to an impartial jury.   For instance, the Court held that trial before a biased judge warrants automatic reversal, regardless of whether that bias would have changed the result: "No matter what the evidence was against [the defendant], he had the right to have an impartial judge." *Tumey v. Ohio*, 273 U.S. 510, 535 (1927).   The Court has often pointed to partiality of the tribunal as an example of structural error warranting automatic reversal. *See Gray v. Mississippi*, 481 U.S. 648, 668 (1987)(plurality opinion)(recognizing that the deprivation of "[t]he right to an impartial adjudicator, be it judge or jury," is among the errors that "can never be treated as harmless error"); *Chapman v. California*, 386 U.S. 18, 23 & n.8 (1967)(citing *Tumey* right to impartial tribunal as a "constitutional right[] so basic to a fair trial that their infraction can never be treated as harmless error"); *Vasquez v.*

29

*Hillery*, 474 U.S. 254, 263 (1986)(biased judge and prejudiced jury counted as "fundamental flaws, which never have been thought harmless")(plurality opinion); *Neder v. United States*, 527 U.S. 1, 8-9 (1999)("[T]rial before a biased judge ... necessarily render[s] a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence."); *Irvin v. Dowd*, 366 U.S. 717, 722 (1961)("In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process."); *cf. Holland v. Illinois*, 493 U.S. 474, 480 (1990) ("The Sixth Amendment requirement of a fair cross section on the venire is a means of assuring, not a representative jury (which the Constitution does not demand), but an impartial one (which it does)."); and *Parker v. Gladden*, 385 U.S. 363, 366 (1966)(defendant "entitled to be tried by 12, not 9 or even 10, impartial and unprejudiced jurors").

A jury that has been provided with unadmitted exhibits by the trial court is neither an impartial nor an unprejudiced jury. The error in Mr. Carey's case was pernicious, poisoned the integrity of the process, and damaged the appearance that juries return their verdicts based solely on the evidence admitted at trial. The district court recognized this and properly determined that Adam Carey must receive a new trial – without any inquiry as to prejudice.

### 2. *Extraneous Influences and* Remmer *Hearings*

There truly was no extraneous or external influence in this case, the influence was delivered directly to the jury by the trial court in the same manner as all of the properly admitted evidence.   While a *Remmer* Hearing may be the proper inquiry for extraneous information, the harm here was one of structural and constitutional error because the jury received unauthorized and specifically excluded exhibits directly from the trial court.   No published case has the unique facts where: (1) an exhibit had already been determined to be inadmissible in a joint trial due to hearsay and Confrontation Clause and *Bruton* concerns; (2) the exhibit had been ruled to open the door to additional evidence, if admitted; (3) the jury did not bring the unadmitted exhibits to the Court's attention prior to reaching a verdict, (4) the district court did not retrieve the exhibits during deliberations or address the issue prior to a verdict; and, (5) the district court did not provide a curative instruction.

There is good reason for a differing standard for the presentation of unadmitted evidence to a jury, as opposed to the extrajudicial contact addressed in *Remmer*.   Mr. Carey's jury had no reason to believe that any of the extraneous information it was exposed to (including Carey Exhibits #3-4) was improper. Throughout the trial, and during its charge, the district court instructed the jury to consider only admitted evidence.   All of the extraneous information was presented

31

to the jury as if it was admitted evidence, down to being included in the very binders the trial court provided for the jury to review. The jury had no reason to believe they were doing anything improper by following the court's instructions.

Further, the limitations of a *Remmer* hearing render it a constitutionally inadequate format for evaluating the error at issue in this case. At a *Remmer* hearing a juror may only testify to "any facts bearing upon the question of the **existence** of any extraneous influence." *See Rushen v. Spain*, 464 U.S. 114, 121 (1983)(**emphasis** added). In other words, the jury may only be asked whether they viewed the unadmitted exhibits. Federal Rule of Evidence 606(b) forbids questioning jurors about how the outside communications, *i.e.*, the unadmitted exhibits, influenced them. This rule provides that a juror may testify about "whether extraneous prejudicial information was improperly brought to the juror's attention," but no juror may testify to "any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict." *See Tanner v. United States*, 483 U.S. 107, 117 (1987); and *United States v. Gonzales*, 227 F.3d 520, 524 (6th Cir. 2000).

A long line of precedent distinguishes between juror testimony about the consideration of extrinsic evidence, which may be considered by a reviewing court,

and juror testimony about the subjective effect of evidence on the particular juror, which may not. *See, e.g., Rodriguez*, 125 F.3d at 744; *Dickson v. Sullivan*, 849 F.2d 403, 406 (9th Cir.1988)("the question of prejudice is an objective, rather than a subjective, one"); *United States v. Bagnariol*, 665 F.2d 877, 884-85 (9th Cir.1981)("Jurors may testify regarding extraneous prejudicial information or improper outside influences. They may not be questioned about the deliberative process or subjective effects of extraneous information, nor can such information be considered by the trial or appellate courts."); *Rushen v. Spain*, 464 U.S. 114, 121 n. 5 (1983); *Mattox v. United States*, 146 U.S. 140, 149 (1892).

This is why courts considering analogous facts determine that the submission to the jury of unadmitted evidence, disguised as admitted exhibits, necessitates a new trial. *See, e.g., United States v. Lentz*, 383 F.3d 191 (4th Cir. 2004) (new trial required after jury received and reviewed notes from day planner that had been specially excluded); *United States v. Barnes*, 747 F.2d 246, 250 (4th Cir. 1984) (Same, noting that "if prejudicial evidence that was not introduced at trial comes before the jury, the defendant is entitled to a new trial."); *Dallago v. United States, 427 F.2d 546 (D.C.Cir.1969)* (failure to redact specifically excluded pages from government exhibit requires new trial even where unclear whether jury reviewed).

Each of these cases was decided after *Remmer*, but none rely upon *Remmer*.

Instead, they distinguish between unadmitted evidence, disguised as admitted evidence, and the kind of extrajudicial conduct the Supreme Court addressed in *Remmer*. In doing so, they recognize the insidious nature of such extraneous information and how it strikes at the very core of the jury trial system.

In fact, many "courts have been reluctant to view a jury's consideration of unadmitted evidence as harmless error." *State v. Anderson*, 251 N.J. Super. 327, 332-333, 598 A.2d 229 (1991*), citing United States v. Luffred*, 911 F.2d 1011, 1014-15 (5th Cir.1990); *United States v. Hans*, 738 F.2d 88, 93 (3rd Cir.1984); *Gibson v. Clanon*, 633 F.2d 851 (9th Cir.1980); *United States v. Howard*, 506 F.2d 865 (5th Cir.1975); *Farese v. United States*, 428 F.2d 178 (5th Cir. 1970); *United States v. Adams*, 385 F.2d 548, 550-51 (2nd Cir.1967); and *Williams v. State*, 448 So.2d 49 (Fla.Ct.App.1984).

In *Anderson*, the court noted that, "the court in *Adams* concluded that the submission to the jury of an unadmitted handwritten note of a narcotics agent was reversible error even though the note was only a synopsis of facts to which the agent testified at trial. Judge Friendly, speaking for the court, stated that 'the principle that the jury may consider only matter that has been received in evidence is so fundamental that a breach of it should not be condoned if there is the slightest possibility that harm could have resulted.' *Id*. at 550-51." *State v. Anderson*, 251

N.J.Super at 333. "Another court described its reluctance to view a jury's consideration of unadmitted evidence as harmless error in metaphorical terms: The dagger of hidden evidence must not be taken from its scabbard for the first time in the jury room to wound the defendant; and unless its piercing effect is only skin deep and without prejudice to the anatomy of the trial, we must apply a constitutional salve. *United States v. Howard, supra*, 506 F.2d at 866.'" *Id.*

The government erroneously claims that "…the Supreme Court and this Court have repeatedly and squarely held that errors similar to the one at issue here— whether classified as an extraneous influence on the jury or a *Bruton* error—are not part of "the very limited class of" errors that fall within the structural error doctrine. Neder, 527 U.S. at 8." (Opening Brief, AR. 25, p. 49). However, perhaps because it recognizes that the particular facts before this Court truly constitute structural error, the government cites no authority addressing the specific issue of unadmitted exhibits, presented as duly admitted exhibits, being provided by the trial court to the jury during deliberations. (Opening Brief, AR. 25, p.46-48). Instead, six of the cases it cites involve internal problems with the jury, unlike the structural issues in Mr. Carey's case.

In *United States v. Smith*, 354 F.3d 390 (5th Cir. 2003), the jurors knew only about the existence of a transcript/report because it was included by the government

35

in court while playing recordings.   The jury asked for the transcript/report during deliberations, and it was <u>not</u> provided to them.   In *United States v. Kechego*, 91 F.4th 845 (6th Cir. 2024), jurors took out their phones whenever disagreeing with the foreperson during deliberations.   In *In re Sittenfeld*, 49 F.4th at 1066-67, a juror posted on her private Facebook page during deliberations.   In *United States v. Tejada*, 481 F.3d 39 (1st Cir. 2007), a juror witnessed someone in the gallery making a gesture.   The trial court voir dired the jurors, issued a curative instruction, and moved on.   In *United States v. Chanthadara*, 230 F.3d 1237 (10th Cir. 2000), six of the twelve jurors were exposed to a news article during the trial that presented the trial judge's opinions about the case.   The issue was recognized before the trial concluded and deliberations began.   The trial court gave an immediate curative instruction and went to some lengths to cure any prejudice resulting from the jurors' exposure to the article.   In *United States v. Olano*, 507 U.S. 725, 738 (1993), one alternate juror was allowed to remain in the deliberation room, but there was no evidence that she participated in deliberations.

Further, five of the cases all involved matters outside of court that might be proper for a *Remmer* inquiry, but that are readily distinguishable from the issues before this Court .   In *United States v. Dutkel*, 192 F.3d 893, 899 n.4 (9th Cir. 1999), a *Habeas* action, Dutkel learned years later that his co-defendant had bribed a juror.

In *Cunningham v. Shoop*, 23 F.4th 636, 649 50 (6th Cir. 2022), a *Habeas* action, Cunningham claimed that a juror failed to disclose her employment at children's services and might have tainted other jurors.    In *United States v. Lanier*, 988 F.3d 284, 295 (6th Cir. 2021), during deliberations, a juror communicated with, her friend, a state prosecutor, to discuss the deliberations.    In *United States v. Warner*, 498 F.3d 666, 679 (7th Cir. 2007), there was an allegation by a disgruntled juror that another juror had used Google and brought "case law" into the jury room.    In *Bomar v. Wetzel*, 2024 WL 1485838, at *6 (E.D. Pa. Apr. 5, 2024), a *Habeas* action, Bomar learned 6 years later that a juror had had a discussion with a deputy about courtroom security, and that the deputy had claimed that there had been a threat.

The facts of *United States v. Sababu*, 891 F.2d 1308 (7th Cir. 1989), as cited by the government, are somewhat similar to Mr. Carey's situation, yet they differ drastically.    Transcripts excluded from evidence were sent into the jury room.    The jury brought it to the judge's attention, and the judge immediately ordered that all government exhibit binders be removed from the jury room and be rechecked for the presence of inadmissible evidence.    The trial judge met with the parties and instructed them to draft a curative instruction.    The Seventh Circuit found the curative instruction, and the fact that the defendant was acquitted on the counts that related to the transcript, meant there "was no reasonable possibility that the transcript

affect the verdict." *Id*. at 34.   Clearly, the transcripts being sent to the jury room is similar to the present issue; however, the *Sababu* jury knew the exhibits were not admitted as evidence, alerted the court, and the court took remedial action prior to a verdict – all of which are factors not present in Mr. Carey's case.

The government contends that "A district court's consideration of prejudice is not optional." (Opening Brief, AR. 25, p.39).   That may indeed be the case for instances of actual external influence, and it may be the case for the disparate factual situations in all of the cases the government cited in support of its position. However, as discussed *supra*, the government's assignment of error to the district court on this front is invalid.   A district court's determination of structural error is discretionary, and once that determination is made, no consideration of prejudice is either required, or allowed.

### 3. Bruton *and Confrontation Clause Violations*

United States Trial Exhibit #131 was a surreptitious recording of an in-person conversation between Bryon Brockway and David Conaway.   Adam Carey was not a party.   Conaway was working for the FBI, and the entire conversation was part of an FBI controlled ruse that's sole purpose was to gather evidence of a past crime in order to prosecute Brockway and the other suspects the FBI believed to be involved in the murders.

At trial, the recording was offered by the government and played for the jury as both a testimonial confession by Brockway as to Lanway's murder and a statement that another individual [because the name was redacted in an attempt to cure a *Bruton* violation] who was with Brockway killed Williams. Therefore, United States Trial Exhibit #131 was unequivocally testimonial. *See United States v. Lundy,* 83 F.4th 615, 620 (6th Cir. 2023).

As discussed in more detail *infra* at **Section II,** Carey Exhibits #3-4 were an excerpt from United States Trial Exhibit #131 that were redacted because they specifically named Adam Carey as the individual with Brockway at the time of the murders. The jury's exposure to Carey #3-4 deprived Mr. Carey of his Sixth Amendment right of confrontation because the exposure to the unadmitted exhibits turned United States Trial Exhibit #131 into a facially incriminating confession of a non-testifying codefendant during the joint trial, in violation of *Bruton*, and clearly not harmless error.

### C.    The District Court Did not Abuse its Discretion in Finding that the Jury's Exposure to Carey Exhibits #3-4 Amounted to Structural Error.

First, the district court conclusively found that the record reflected that the jury was exposed to Carey Exhibits #3-4. (Memorandum and Order, R. 561, #6411). The government doesn't even attempt to argue otherwise. The district court then correctly applied the relevant law to the facts of this case and determined

39

that its own error was structural.   (Memorandum and Order, R. 561, #6416).   In the case of structural error, the government is not entitled to deprive the defendant of a new trial by showing that the error was "harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24.   When a structural error is objected to and then raised on direct review, the defendant is entitled to relief without any inquiry into harm.   *Weaver v. Massachusetts*, 582 U.S. 286, 286 (2017).

Despite these clear facts and precedent, the government puts its head in the sand and complains that the district court was somehow still required to conduct a purely speculative harmlessness analysis, and that it abused its discretion in failing to do so.   (Opening Brief, AR. 25, p.49-50).   This is simply not the law.

Next, the government minimizes the district court's rationale and asserts that "the district court vastly overread *Weaver*."   (Opening Brief, AR. 25, p.50). However, the district court actually made a quite thorough analysis of *Weaver* before determining that its error was structural.   "After surveying previous cases, Justice Kennedy observed that "the precise reason why a particular error is not amenable to [harmless-error] analysis—and thus the precise reason why the Court has deemed it structural—varies in a significant way from error to error." *Id*. at 295.   The Court then summarized three rationales for why a particular error may be deemed structural: (1) "if the right at issue is not designed to protect the defendant from

40

erroneous conviction but instead protects some other interest"; (2) "if the effects of the error are simply too hard to measure"; and (3) "if the error always results in a fundamental unfairness. *Id.* at 295-96.   More than one of these rationales may be part of the reason an error is deemed to be structural, but Justice Kennedy emphasized that "an error can count as structural **even if the error does not lead to fundamental unfairness in every case**." Id. at 296 (citing *Gonzalez-Lopez*, 548 U.S. at 149, n.4 (rejecting the idea that structural errors "always or necessarily render a trial fundamentally unfair and unreliable"))."   (Memorandum and Order, R. 561, #6415-6416, **emphasis added**).   The district court further noted that "In identifying "at least three broad rationales," Justice Kennedy left open the possibility that there are other reasons a particular error is not amenable to harmless-error review. *Weaver*, 582 U.S. at 295."   (Memorandum and Order, R. 561, #6415-6416 n.15).

The district court was mindful of its boundaries and recognized that, while it did not fit one of the non-exclusive, three enumerated categories in *Weaver*, "…it bears mentioning that the errors in this case did result in fundamental unfairness. Here, due to an administrative mistake, the court provided the jury exhibits that had not been admitted into evidence. And, unlike cases in which the extraneous information is obviously not part of the evidence presented during the trial, this extraneous evidence was delivered to the jury in evidence binders, in some cases

41

marked with evidence stickers. Likely in part because of the apparent imprimatur of the Court, the error went unnoticed until well after the jury reached a verdict. Defendants are not entitled to a perfect trial, but they are entitled to a fair trial. *Lutwak v United States*, 344 U.S. 604, 619 (1953). The error here resulted in fundamental unfairness to these defendants."  (Memorandum and Order, R. 561, #6416-6417).

Further, the district court found that its error implicated the second rationale articulated by Justice Kennedy in *Weaver* – the effects of the error are simply too hard to measure, because the court had specifically ruled that admission of Carey Exhibits 3 and 4 would lead to additional admissible evidence.

> "The structural error here is distinguishable because the Court had ruled that the erroneously provided documents would open the door to the presentation of additional evidence. Thus, any inquiry into prejudice would necessitate consideration not only of the effects of the evidence erroneously presented to the jury, but also the effects of evidence not presented, not to mention speculation about the potential arguments of counsel had the various exhibits been properly admitted. Neither the parties nor the Court can know what impact, if any, the evidence Brockway and Maund would have introduced would have on the jury because they were not given that opportunity, nor was Carey or the Government given the opportunity to test that evidence through cross-examination or rebuttal evidence."

***

But nobody can measure, with any degree of certainty, the effects of something that did not happen. *Weaver*, 582 U.S. at 295. Under the circumstances here, "[h]armless-error analysis … would be a speculative inquiry into what might have occurred in an alternate

42

universe." Gonzalez-Lopez, 548 U.S. 150.

(Memorandum and Order, R. 561, #6417-6418).

The government then descends into rank hyperbole, complaining that the district court's reasoning would result in almost every trial error or extraneous influence resulting in automatic vacatur of a defendant's conviction, and that the district court has made a "staggering enlargement" of the structural error doctrine. (Opening Brief, AR. 25, p.51-52).   Finally, the government seemingly concedes the point that Mr. Carey has made repeatedly herein – there is no precedent from the Supreme Court, or this Court, that hold that the district court's error in Mr. Carey's case is not structural error.   (Opening Brief, AR. 25, p.52).

In sum, just because the government says that an error wasn't structural, doesn't make it so.  That is a judicial determination, not one for the executive branch to make unilaterally, and the district court ruled, well within its discretion, that its own error was indeed structural after applying the relevant judicial decisions available to it.   Indeed, the government has not cited a single case where the precise, multi-faceted, and complicated error that is currently before this Court has been judicially determined to be "non-structural."   Thus, this Court should not second guess the district court's careful, deliberate, and well-reasoned decision.   Rather, it should affirm the district court's order granting Mr. Carey a new trial and remand

this case to the district court for trial.

### D.    Adoption and Incorporation by Reference of Legal Arguments Contained in the Briefs of Defendant-Appellee Eric Charles Maund and Defendant-Appellee Bryon Brockway.

This appeal involves multiple appellees.   Arguments set forth in Mr. Maund's Response Brief (Maund Brief, AR. 42) and Mr. Brockway's Response Brief (Brockway Brief, AR. 40) are equally applicable to Mr. Carey's issue(s) and argument(s).

Pursuant to Rule 28(i) of the Federal Rules of Appellate Procedure, Mr. Carey hereby adopts and incorporates said arguments by reference herein as if set forth verbatim.

## II. WHILE NO HARMLESS ERROR ANALYSIS IS ALLOWED, THE JURY'S EXPOSURE TO CAREY EXHIBITS #3-4 WAS PREJUDICIAL.

As a threshold matter, deciding harmlessness is both improper and unnecessary as the error at hand is structural in nature. Despite the government's conclusory assertions, the record is not "fulsome," due, in part, to the constitutional infirmities of the *Remmer* hearing, and there was not "overwhelming evidence" of Adam Carey's guilt. The government is not entitled to the deferential Rule 29 standard, and what Adam Carey did or did not know, and when, was a central question in this case. None of the government's citations to the record (Opening Brief, AR. 25, p.12-41) demonstrate that Mr. Carey had any direct knowledge of the charged murder-for-hire conspiracy prior to the murders occurring.

This Court should decline the government's invitation to engage in any hypothetical harmlessness inquiry and summarily remand the case to the district court for a new trial.

### A. Standard of Review

There is a serious constitutional question as to who has the burden of proof. A jury's consideration of extrinsic information raises a presumption of prejudice, and the government bears the burden of showing beyond a reasonable doubt that the extrinsic information did not contribute to the conviction. *Remmer v. United States*,

347 U.S. 227, 229 (1954); *United States v. Hines*, 696 F.2d 722, 730–31 (10th Cir. 1982); *Owen v. Duckworth*, 727 F.2d 643, 646 (7th Cir. 1984); *United States v. Delaney*, 732 F.2d 639, 642 (8th Cir. 1984); *United States v. Littlefield*, 752 F.2d 1429, 1431–32 (9th Cir. 1985); *United States v. Williams*, 809 F.2d 75, 81 (1st Cir. 1986); and *United States v. Ronda*, 455 F.3d 1273, 1299–1300 (11th Cir. 2006).

In *United States v. Pennell*, 737 F.2d 521, 532 (6th Cir. 1984), this Court held that the Supreme Court's opinion in *Smith v. Phillips*, 455 U.S. 209 (1982), reinterpreted *Remmer* so as to shift the burden of showing prejudice to the defendant. No other federal appellate court, however, has departed from *Remmer's* statement of the legal standard for evaluating the effect of an improper judicial contact. *See United States v. Butler*, 822 F.2d 1191, 1195 (D.C. Cir. 1987), citing, *United States v. Littlefield*, 752 F.2d 1429, 1431-32 (9th Cir. 1985)(criticizing Pennell); *Owen v. Duckworth*, 727 F.2d 643, 646 (7th Cir. 1984); *United States v. Webster*, 750 F.2d 307, 338 (5th Cir. 1984); *United States v. Delaney*, 732 F.2d 639, 642 (8th Cir. 1984); *United States v. Hines*, 696 F.2d 722, 730-31 (10th Cir. 1982); *Hobson v. Wilson*, 237 U.S. App. D.C. 219, 737 F.2d 1, 47-49 (D.C. Cir. 1984).

Moreover, *Pennell* was decided prior to the Supreme Court's opinion in *United States v. Olano*, 507 U.S. 725 (1993). As the Seventh Circuit noted, *Pennell* "constitute(s) an unreasonable interpretation of Supreme Court law, given the clear

46

language in *Olano* that explains, "'There may be cases where an intrusion should be presumed prejudicial.'" 507 U.S. at 739. *Hall v. Zenk*, 692 F.3d 793, 802 (7th Cir. 2012).

The government attempts to side-step this constitutional quagmire by conceding, for purposes of this appeal, that it must demonstrate that the jury's exposure to the unadmitted exhibits was harmless beyond a reasonable doubt. (Opening Brief, AR.25, p.55-56).   Given the government's assumption of this highest of burdens, the record is "overwhelmingly" clear that it cannot come close to clearing that high bar.

**B.    Law**

The government contends that a "constitutional error—including a jury's exposure to extraneous information—is harmless if the United States has proved "beyond a reasonable doubt that the outcome would not have been different without" the error.   *Campbell*, 122 F.4th at 630; *Lanier*, 988 F.3d at 295 n.13."   (Opening Brief, AR.25, p.47-48).   As discussed, *infra.,* the unadmitted exhibits that were provided to the jury were not your typical "extraneous" information.   They were provided to the jury with the imprimatur of the court as properly admitted evidence to be considered during deliberations, and the exhibits were reviewed by the jurors – thus, the error was structural.

Nevertheless, the government relies on the argument that this Court has repeatedly found constitutional errors to be harmless beyond a reasonable doubt where a defendant has confessed to his participation in the offense of conviction, *Stanford*, 266 F.3d at 457, and where "overwhelming" admissible evidence otherwise supports the jury's verdict, *United States v. Winston*, 55 F. App'x 289, 296 (6th Cir. 2003).   Fortunately for Mr. Carey, none of those factual scenarios are actually present in this matter.

**C.    Mr. Carey did not Confess to his Participation in the Charged Murder-or Hire Conspiracy, and there was not Overwhelming Admissible Evidence of Mr. Carey's Guilt.**

In a hasty attempt to meet its high burden, the government yet again attempts to lump Mr. Carey into broad, generalized assertions that are not supported by the record.   "[A] mountain of admissible evidence—including the defendants' own recorded statements confessing to their involvement in the murders, cooperator and witness testimony, surveillance footage, and bank records— established each of the defendants' guilt beyond a reasonable doubt."   (Opening Brief, AR.25, p.57-58).

As set forth *infra* in the **Statement of the Case**, this position is patently false as applied to Mr. Carey.   There is no recorded statement of Mr. Carey confessing his involvement in the murders.   There was no cooperator or witness testimony that Mr. Carey had any direct knowledge of the charged murder-for-hire conspiracy prior

48

to the murders occurring.    There was no surveillance footage of Mr. Carey committing any of the alleged crimes.    There were no bank records whatsoever introduced at trial that indicated Mr. Carey's involvement in the charged crimes.

If those inaccurate generalizations weren't enough, the government goes further and asserts gross mischaracterizations of the record in an attempt to bolster its harmless error argument.    (Opening Brief, AR.25, p.58).    First, what the jury actually heard from Mr. Peled was that he only had communications with Bryon Brockway and Eric Maund prior to the murders, and that those two were the only individuals with knowledge of the charged conspiracy.    There is no testimony whatsoever that Mr. Peled met, spoke to, or even knew the name of Adam Carey prior to the Murders.    (Trial Transcript, R. 458, #3321-3373).

Second, the Jury did not listen to "Carey's own recorded statements to Conaway explaining mistakes he made during the murder-for-hire scheme."    The government cites United States Trial Exhibit #125 for that proposition, but that recording does not discuss any criminal conduct charged in this matter.    Further, the government asserts that the same exhibit indicates that Carey offered to join Conaway's fictional murder-for-hire scheme concocted by the FBI.    Instead, an unbiased, rational listener would clearly see that Mr. Carey knew he was being recorded and was simply going along with whatever Mr. Conaway said because he

didn't know who was listening.   In fact, Mr. Conaway, the government's puppet, testified to that at trial.   (Trial Transcript, R. 458, #4204-4205).

Third, the government claims that Mr. Carey being at Williams' apartment in the days prior to the murders advances its "overwhelming evidence" argument.   It does not.   Both David Conaway and Anthony Repinski, both government witnesses, each testified that they were conducting surveillance with Mr. Carey at Williams' apartment prior to the murders, and each testified that there was nothing nefarious or illegal about those activities.   (Trial Transcript, R. 461, #4187, #4249).

Perhaps the most shocking misrepresentation that the government makes in support of its deceptive "overwhelming evidence" claim as to Mr. Carey is that the jury heard "*Conaway's testimony that Carey had confessed to committing the murders in exchange for cash*.   (Trial Transcript, R. 461, #4003)."   (Opening Brief, AR.25, p.58).   When one actually reads Page ID #: 4003, it is abundantly clear that it contains Conaway's recollection and interpretation of an alleged, unverifiable comment attributed to Mr. Carey one evening while Mr. Conaway was in Nashville. Mr. Conaway himself describes the alleged statement as "rather vague" and that it required interpretation.   Even more importantly, this alleged, unverifiable, vague statement that required interpretation by the government's witness occurred while Mr. Conaway was in Nashville and days before the murders.   For the government

to present this as a fact that the Court should rely upon in making a harmless error determination is both desperate and dubious, at best.

### D.    Mr. Carey was Prejudiced by the Unadmitted Exhibits being Provided to the Jury.

Mr. Carey maintains his position that the error in this case was structural and that any "harmless error" or prejudice analysis is improper.  He also does not concede that he should bear any burden of establishing any prejudice.  However, since the government's summary argument that the jury's exposure to Carey #3-4 could not have been harmful to Mr. Carey because he sought to introduce the exhibit (Opening Brief, AR.25, p.58-59), is so oversimplified and nonsensical, he will briefly address it.

Carey Exhibits 3 and 4 were marked for identification purposes only and were not admitted into evidence.  They were tendered only during a, jury out, offer of proof to preserve/create a record due to the Court's rulings prior to, and during, trial. Prior to trial, Mr. Carey moved to exclude the entirety of the recording (United Staes Exhibit #131) because, *inter alia*, he would have no opportunity to cross-examine Mr. Brockway about its contents unless Mr. Brockway testified (he did not). (Motion in Limine #8, R. 299, #1518-1523).   The Court denied Mr. Cary's motion, but ordered redactions to the recording.   (Order, R. 385, #2245-2250).   Per the Court's Order, Carey Exhibits 3 and 4 were redacted from the recording admitted

into evidence and played for the jury. In both of those exhibits, Adam Carey is specifically named as the person with Bryon Brockway when Holly Williams and William Lanway were killed. Providing the jury with those two exhibits expressly violated the rule of *Bruton v. United States*, 391 U.S. 123 (1968), and the district court's rulings.

In *Bruton*, the Supreme Court held that the confrontation/cross-examination right was violated by the introduction of Bruton's co-defendant's confession at their joint trial, where that confession facially implicated Bruton and was not otherwise admissible against him. Moreover, the Court rejected the argument that jury instructions forbidding use of the statement in Bruton's case satisfied Sixth Amendment concerns. The Court held that, "in the context of a joint trial we cannot accept limiting instructions as an adequate substitute for (Bruton's) constitutional right of cross examination." *Id*. at 137. The Court reasoned that there was a substantial risk that the jury nonetheless looked to the incriminating co-defendant's statements in determining Bruton's guilt. *Id*. at 126.

The Court in *Bruton* took pains to emphasize the importance of the constitutional protections at play. "We still adhere to the rule that an accused is entitled to confrontation of the witnesses against him and the right to cross examine them . . . We destroy the age-old rule which in the past has been regarded as a

52

fundamental principle of our jurisprudence by a legalistic formula, required of the judge, that the jury may not consider any admissions against any party who did not join in them.    We secure greater speed, economy and convenience in the administration of the law at the price of fundamental principles of constitutional liberty.    That price is too high." *Bruton v. United States*, 391 U.S. 123, 134-35 (1968).

It must be noted that Adam Carey diligently and vigorously attempted to prevent exactly the type of error that has occurred in this case.    Prior to trial, Mr. Carey filed a motion seeking to prevent the "displaying/publishing or otherwise presenting to the jury any evidence (including, but not limited to, proposed exhibits, documents, summaries, charts, recorded conversations, photographs ... until such evidence has properly been admitted pursuant to the Federal Rules of Evidence." (Motion in Limine #4, R. 286, #1435-1437).

Likewise, Adam Carey filed a motion to sever defendants in this case. (Moton to Sever, R. 137, #552-563).    In that motion, Mr. Carey noted that The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."    The right of confrontation includes the right of cross examination. *Pointer v. Texas*, 380 U.S. 400, 404-407 (1965).    "An accused is deprived of his

rights under the Confrontation Clause when the confession of a non-testifying codefendant that implicates the accused is introduced into evidence at their joint trial." *United States v. Cope*, 312 F.3d 757, 780 (6th Cir. 2002), citing *Bruton*, 391 U.S. at 137.

Mr. Carey noted that the admission of Bryon Brockway's statement that Adam Carey killed one of the victims - if Brockway did not testify - would constitute *Bruton* error.   A *Bruton* error requires reversal unless admission of the statement is found "harmless beyond a reasonable doubt," under the test enunciated in *Chapman v. California*, 386 U.S. 18 (1967).   In *Chapman*, the Court left no doubt that for an error to be "harmless" it must have made no contribution to a criminal conviction. Id., at 26 (emphasis added).   Given the joint trial at issue, the district court obviously denied Mr. Carey's request for severance. (Memorandum and Order, R. 176, #804-809).

Here, the prejudice from the jury's exposure to the inadmissible exhibits and the prejudice inuring to Adam Carey as a result of the jury having seen the exhibits is readily apparent.   The statements in the exhibits were not elicited from the witness stand and/or played in open court, and therefore were not subject to the crucible of cross examination.   Mr. Carey was also denied any opportunity to provide context, explanation, or argument to the erroneously admitted exhibits.

The inadmissible exhibits improperly bolstered the government's theory of the case and irreparably damaged Carey's defense.  In short, it is difficult to conceive of evidence more inherently prejudicial than the unadmitted exhibits.  Even if the Court were to hold that Mr. Carey had some burden of establishing prejudice, which he again does not concede, the record establishes the harmful error.  Given the importance of the constitutional protection at issue, it is clear that the exhibits wrongly provided to the jury during their deliberations were extremely prejudicial to Mr. Carey.

### E.    Adoption and Incorporation by Reference of Legal Arguments Contained in the Briefs of Defendant-Appellee Eric Charles Maund and Defendant-Appellee Bryon Brockway.

This appeal involves multiple appellees.  Arguments set forth in Mr. Maund's Response Brief (Maund Brief, AR. 42) and Mr. Brockway's Response Brief (Brockway Brief, AR. 40) are equally applicable to Mr. Carey's issue(s) and argument(s).

Pursuant to Rule 28(i) of the Federal Rules of Appellate Procedure, Mr. Carey hereby adopts and incorporates said arguments by reference herein as if set forth verbatim.

## **CONCLUSION**

Based on the foregoing, Adam Carey respectfully requests that this Court affirm the district court's order granting him a new trial and remand this case to the district court for trial.

Respectfully submitted,

s/ Benjamin H. Perry
BENJAMIN H. PERRY, ESQ.
40 Music Square East, Suite 100
Nashville, Tennessee 37203-4323
(615) 242-4200
ben@benperrylaw.com

*s/ John Bailey*
JOHN BAILEY, ESQ.
330 Franklin Road, Suite 135A-427
Brentwood, TN 37027
(615) 319-1342
hansgurkin@att.net

*Attorneys for Adam Carey,*
*Defendant-Appellee*

## <u>CERTIFICATE OF COMPLIANCE</u>

This Brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,504 words, excluding the parts of the Brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because the Brief has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point font, Times New Roman.

May 8, 2025
Date

s/ Benjamin H. Perry
BENJAMIN H. PERRY

*Attorney for Adam Carey*
*Defendant-Appellee*

57

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing has been sent via the Court's electronic filing system (CM/ECF), *or*, if not registered, sent via U.S. Mail, postage prepaid, to all parties of record, including but not limited to:

Robert E. McGuire                          Nicholas J. Goldin
Acting United States Attorney, MDTN        Appellate Chief, MDTN
719 Church Street, Suite 3300              719 Church Street, Suite 3300
Nashville, Tennessee 37203                 Nashville, Tennessee 37203

this 8th day of May, 2025.

s/ Benjamin H. Perry
BENJAMIN H. PERRY


*Attorney for Adam Carey*
*Defendant-Appellee*

58

## ADDENDUM DESIGNATING RELEVANT DISTRICT COURT DOCUMENTS

Pursuant to Sixth Circuit Rule 30(b), Defendant-Appellee Carey agrees with the contents of the Plaintiff-Appellant's designation of relevant documents from the district court.    (Opening Brief, AR. 25, p.58-59).    Defendant-Appellee Carey additionally designates the following relevant documents from the district court's electronic filing system:

| District Court Docket Entry No. | Document Description | Page ID # |
|---|---|---|
| R. 57 | Minute Entry | 285 |
| R. 60 | Order of Detention | 288 |
| R. 235 | Carey MIL #4 | 197-218 |
| R. 244 | Order Continuing Trial | 1313-1314 |
| R. 286 | Carey MIL #4 | 1435-1437 |
| R. 299 | Carey MIL #8 | 1518-1523 |
| R. 300 | Carey MIL #9 | 1524-1528 |
| R. 321 | Government's Response to MIL #8-9 | 1695-1699 |
| R. 330 | Carey Reply | 1741-1743 |
| R. 334 | Carey Motion to Reconsider | 1751-1758 |
| R. 367 | MIL Order | 2144-2145 |

| R. 383 | Reconsideration Order | 2238-2242 |
|:------:|:----------------------|:---------:|
| R. 385 | Recordings Order | 2245-2250 |