RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0050p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

    *Plaintiff-Appellant*,

  *v.*

ERIK CHARLES MAUND; BRYON BROCKWAY; ADAM CAREY,

    *Defendants-Appellees*.

No. 24-5932

---

Appeal from the United States District Court for the Middle District of Tennessee at Nashville.
No. 3:21-cr-00288—William Lynn Campbell Jr., District Judge.

Argued: December 11, 2025

Decided and Filed: February 23, 2026

Before: MOORE, THAPAR, and RITZ, Circuit Judges.

---

## COUNSEL

**ARGUED:** Nicholas J. Goldin, UNITED STATES ATTORNEY'S OFFICE, Nashville, Tennessee, for Appellant. David M. Gonzalez, SUMPTER & GONZÁLEZ, L.L.P., Austin, Texas, for Appellee Maund. Luke A. Evans, FIOLA PARKER, Murfreesboro, Tennessee, for Appellee Brockway. Benjamin H. Perry, LAW OFFICE OF BENJAMIN H. PERRY, Nashville, Tennessee, for Appellee Carey. **ON BRIEF:** Nicholas J. Goldin, Robert E. McGuire, Rascoe Dean, Brooke Carey Farzad, UNITED STATES ATTORNEY'S OFFICE, Nashville, Tennessee, for Appellant. David M. Gonzalez, SUMPTER & GONZÁLEZ, L.L.P., Austin, Texas, Samuel E. Bassett, Perry Q. Minton, MINTON, BASSETT, FLORE & CARSEY, Austin, Texas, John-David H. Thomas, BARNES & THORNBURG, L.L.P., Nashville, Tennessee, for Appellee Maund. Luke A. Evans, FIOLA PARKER, Murfreesboro, Tennessee, for Appellee Brockway. Benjamin H. Perry, LAW OFFICE OF BENJAMIN H. PERRY, Nashville, Tennessee, John Bailey, Brentwood, Tennessee, for Appellee Carey.

## OPINION

RITZ, Circuit Judge. A jury convicted Erik Maund, Adam Carey, and Bryon Brockway of various offenses related to a murder-for-hire. During jury deliberations, however, the district court inadvertently gave the jury several unadmitted exhibits and failed to provide some of the admitted exhibits. The district court only realized its error months after the verdict. Upon receiving notice of the error, defendants each moved for a new trial. After a hearing to determine the jury's exposure to the unadmitted exhibits, the district court found its error to be structural and granted a new trial. The government appealed, arguing that the error was not structural, the harmless-error standard applies instead, and the error was harmless. We agree and reverse.

I.

This case involves a murder-for-hire scheme resulting in the deaths of Holly Williams and her boyfriend William Lanway. In February 2020, Maund had an affair with Williams in Nashville. After the affair, Lanway blackmailed Maund, demanding money in exchange for not disclosing the affair to Maund's family. Maund then hired Gilad Peled to deal with the blackmail problem. Peled, in turn, hired several people—including Brockway, Carey, Anthony Repinski, and David Conaway—to surveil Williams and Lanway. In March 2020, Maund paid Peled to have Williams and Lanway murdered, and Brockway and Carey carried out the murders in Nashville that month.

A.

A grand jury indicted Maund, Brockway, and Carey for a murder-for-hire conspiracy, kidnapping, and a kidnapping conspiracy resulting in death. The district court denied the defendants' motions to sever and tried the defendants jointly. In November 2023, a jury convicted all three defendants of the murder-for-hire conspiracy; the jury also convicted Brockway and Carey of kidnapping and conspiracy to commit kidnapping.

A little over two months after the convictions, however, the district court discovered that the evidence delivered to the jury room for deliberations did not exactly match the evidence admitted at trial. The court had erroneously provided the jury with ten unadmitted exhibits[1] and failed to deliver three admitted exhibits.[2] Two of the unadmitted exhibits erroneously given to the jury (Carey Exhibits 3 and 4), and their relation to a separate proffer of evidence (Peled's testimony about Carey's knowledge of the crime), are the primary focus of this appeal.

B.

At trial, the government presented significant evidence of defendants' guilt, most of which was not compromised by the court's error. We briefly summarize that evidence here.

The government presented both documentary and testimonial evidence inculpating Maund, Carey, and Brockway. For example, the government introduced recorded and transcribed conversations in which Maund, Carey, and Brockway separately discussed their involvement in the murder-for-hire plot. In these conversations, Carey and Brockway each further agreed to an additional, government-invented murder-for-hire scheme. Additionally, Peled (who pled guilty) gave testimony directly implicating Maund, Carey, and Brockway in the crimes, and Repinski and Conaway (who were not charged) gave testimony directly implicating Carey and Brockway. This testimony was corroborated via emails and messages between defendants about the plot. Moreover, one of Maund's coworkers testified that he had introduced Maund to Peled so that Peled could help Maund handle Lanway's extortion attempts.

The government's evidence also placed Carey and Brockway near the crimes when they occurred. For example, Carey and Brockway stayed in Nashville immediately prior to and during the murders, and then left immediately after. Brockway also rented a car in Nashville that matched the vehicle captured on surveillance footage driving near the site where the victims'

---

[1] Several of these unadmitted exhibits included unredacted versions of admitted exhibits. The ten unadmitted but provided exhibits included: Gov. Ex. 254 (photo from Carey property); Gov. Ex. 257 (same); Gov. Ex. 359 (CD listing Maund's wire transfers); Carey Ex. 3 (unredacted recording); Carey Ex. 4 (unredacted transcript); Maund Ex. 8 (bank records); Maund Ex. 9 (same); Maund Ex. 51 (spreadsheet of messages between victims); Maund Ex. 59 (video surveillance of Williams's apartment); and Maund Ex. 78 (same).

[2] The three admitted but not provided exhibits included: Gov. Ex. 103 (CD with messages between parties), Gov. Ex. 112 (CD with phone records), and Maund Ex. 81 (USB with aerial surveillance of Maund's residence).

bodies were found.  Further, the government produced surveillance footage placing Carey outside Williams's apartment immediately prior to the murders.

Finally, the government introduced financial records inculpating Brockway and Carey and showing that Maund transferred around $150,000 to Peled on the afternoon of the murders.

C.

This appeal primarily concerns two statements, both relating to Carey's knowledge of the crimes.  The first statement—Brockway saying that "Adam [Carey] didn't know any of this shit"—was part of Carey Exhibits 3 and 4.  RE 496-3, Carey Ex. 4, PageID 5721.  The second statement—Carey saying "nobody cares about [the murder victims]"—came from a portion of Peled's testimony proffered outside the jury's presence.  RE 458, Trial Tr., PageID 3531 (citation modified).  We discuss the procedural history of each statement below.

In October 2021, Conaway cooperated with the government to covertly record a conversation with Brockway.  Versions of this conversation in recorded and transcribed form became Government Exhibits 131 and 132, which were redacted and admitted, and Carey Exhibits 3 and 4, which were unredacted and unadmitted.  In the conversation, Brockway discussed the Nashville murder-for-hire scheme and agreed to participate in an additional, government-invented murder-for-hire scheme proposed by Conaway.

The critical part of the conversation is a single sentence where Brockway says: "Adam [Carey] didn't know any of this shit."  RE 496-3, Carey Ex. 4 (Unredacted), PageID 5721; RE 363-4, Gov. Ex. 132 (Redacted), PageID 2084.  This statement suggested a relative lack of knowledge on Carey's part regarding the murder-for-hire scheme.

The defendants each moved to exclude the entirety of Brockway's conversation, which the government presented as Government Exhibits 131 (the recording) and 132 (the transcript). But the court denied the defendants' motions and admitted the government exhibits. Importantly, though, Government Exhibits 131 and 132 did not contain the at-issue statement ("Adam didn't know any of this shit."), because the government voluntarily redacted this

sentence to avoid any potential Confrontation Clause problems under *Bruton v. United States*, 391 U.S. 123 (1968).

After the court admitted Government Exhibits 131 and 132, the defendants disagreed over the redaction of "Adam didn't know any of this shit." Carey, apparently believing that this redacted statement helped exculpate him, sought to introduce it at trial via Carey Exhibits 3 (a USB-drive recording) and 4 (a one-page transcript). These two exhibits each contained a short excerpt of Brockway's conversation with the unredacted statement.[3]

But Maund and Brockway argued that introducing Brockway's statement "opened the door as to what Adam [Carey] did know" about the crimes. RE 461, Trial Tr., PageID 4109-14; RE 458, Trial Tr., PageID 3264-72. Maund and Brockway further argued that if Carey introduced Carey Exhibits 3 and 4, thereby placing Carey's knowledge of the crimes at issue, they should be allowed to introduce evidence rebutting Carey's lack of knowledge. Specifically, Maund and Brockway wanted to introduce Peled's testimony that, in July 2020, when Peled asked Carey whether Carey had heard any news about the murders, Carey responded: "Don't worry about it. Nobody cares about them. They're low, common criminal. Nobody cares about them." RE 458, Trial Tr., PageID 3531.

Carey objected to the admission of Peled's testimony relating to Carey's knowledge and moved to exclude it. The government agreed not to introduce Peled's testimony about Carey's July 2020 statement in its case-in-chief unless Carey opened the door to it by placing his knowledge at issue, thus leaving the defendants to sort out the dispute over these statements.

To preserve the record amid this dispute, defendants presented both Brockway's statement of Carey's lack of knowledge and Peled's testimony of Carey's knowledge outside the presence of the jury. Carey proffered Carey Exhibits 3 and 4, containing Brockway's statement, and Maund and Brockway elicited Peled's testimony relating to Carey's knowledge.

The district court ruled that if Carey introduced Carey Exhibits 3 and 4, he would put his knowledge at issue, and Maund and Brockway could then introduce Peled's testimony of Carey's

---

[3]In Carey Exhibit 4, Brockway's statement ("Adam didn't know any of this shit.") was underlined in blue ink, but it is unclear whether this edit occurred before or after the jury received the transcript.

knowledge. In other words, the court left it up to Carey: either the court would admit Carey Exhibits 3 and 4 *and* Peled's testimony relating to Carey's knowledge, or the court would admit none of the above. Carey chose not to introduce Carey Exhibits 3 and 4, so the court admitted neither the Carey exhibits nor Peled's testimony about Carey's knowledge.

### D.

But the district court failed to properly carry out its ruling on the Carey Exhibits. Despite not admitting Carey Exhibits 3 and 4, the district court erroneously provided the jury with both exhibits, along with other unadmitted exhibits, during deliberations. But Peled's testimony about Carey's statement—which the court previously ruled to be conditionally admissible on the admission of Carey Exhibits 3 and 4—was not delivered to the jury.

Over two months after the jury convicted all three defendants, the district court realized its error. On January 29, 2024, the court held a hearing to notify the parties of the error. The court allowed the parties to file motions regarding the error and requested that the parties refrain from filing any other post-trial motions until the court resolved those motions.

Each defendant filed a motion for a new trial under Federal Rule of Criminal Procedure 33. The defendants argued that the error warranted a new trial for several reasons, including per se prejudice, structural error, a due process violation, and actual prejudice. In response, the government argued for a hearing under *Remmer v. United States*, 347 U.S. 227 (1954), to determine the harmfulness of the error. Defendants replied, reiterating their various arguments for a new trial and arguing against a *Remmer* hearing.

The district court held a *Remmer* hearing on May 15, 2024, to question the jurors individually about their exposure to the error. Upon questioning, the jurors generally recalled listening to a recording on USB, which may have been unadmitted Carey Exhibit 3 containing Brockway's statement that "Adam didn't know any of this shit." At least two jurors also testified they specifically recalled seeing the Carey Exhibit 3 USB drive. In contrast, most of the jurors did not recall seeing any transcripts, such as Carey Exhibit 4, during deliberations. Summarizing its factual findings after the hearing, the district court stated:

> From the testimony at the hearing, the Court concludes that at least one of the jurors reviewed the unredacted transcript of the excerpt of the recording of the October 25, 2021 meeting between Brockway and Conaway, which was Carey Exhibit 4. It is also likely that jurors listened to the unredacted recording. Two jurors recognized the appearance of the USB drive that was Carey Exhibit 3 and one juror said that it was used to play a recording. If that juror's recollection is accurate, it would have exposed all of the jurors to the unredacted recording.

*United States v. Maund, et al.*, No. 3:21-CR-00288, 2024 WL 4217518, at *12 (M.D. Tenn. Sept. 17, 2024). The government does not dispute these factual findings on appeal.

The district court also committed a second, separate error at the *Remmer* hearing. At trial, each party presented its exhibits in different colored physical binders—red for Maund, black for Carey, white with a blue slip for Brockway, and white with no blue slip for the government—and the jury received the separate binders in deliberations. Post-verdict, the court clerk consolidated all three defense binders into a single red binder. The court, however, did not realize this consolidation occurred post-verdict; it erroneously led the parties to believe that the jury had received a single red binder of defense exhibits—containing the unadmitted evidence—during deliberations. As a result, at the *Remmer* hearing the defendants focused their juror questioning on the single red binder. The district court, though, ruled that this error did not materially affect the hearing.

Ultimately, the district court found that the primary trial error—the jury's exposure to unadmitted exhibits with no curative instruction—was structural and granted defendants' motions for a new trial. The district court reasoned that "the effects of the error are simply too hard to measure" and did not offer any alternative harmless-error analysis. *Maund*, 2024 WL 4217518, at *15.

E.

On appeal, the government alleges that the trial error was not structural and that the district court abused its discretion in granting a new trial without conducting a harmless-error analysis. Further, the government urges us to find the error harmless beyond a reasonable doubt as to each defendant, because of the overwhelming evidence of guilt and because Carey Exhibits 3 and 4 were unlikely to have affected the jury's decision.

The defendants urge us to affirm the district court's structural error ruling. In the alternative, defendants argue that the error, even if not structural, was harmful, so a new trial is appropriate.

II.

Everyone agrees this case suffered serious error. The main question is what to do about it. Although we generally review a district court's grant of a new trial in a criminal case for abuse of discretion, we review de novo the district court's application of the proper legal standard, including the determination whether harmless-error review applies. *United States v. Willis*, 257 F.3d 636, 642 (6th Cir. 2001); *see also United States v. Munoz*, 605 F.3d 359, 366 (6th Cir. 2010). Accordingly, we review the district court's structural error determination de novo, and the ultimate grant of a new trial for abuse of discretion. *See Washington v. Recuenco*, 548 U.S. 212, 218-19 (2006) (treating structural error as a legal question).

A.

Under Federal Rule of Criminal Procedure 33, a district court may "grant [ ] a new trial where substantial legal error has occurred" if the "interest of justice [so requires]." *United States v. Robinson*, 99 F.4th 344, 367 (6th Cir. 2024) (citation modified); Fed. R. Crim. P. 33. But not all trial errors, not even all "constitutional errors[,] . . . require reversal of the conviction." *Sullivan v. Louisiana*, 508 U.S. 275, 278-79 (1993) (citing *Chapman v. California*, 386 U.S. 18, 22-24 (1967)). Indeed, most "trial errors—even non-structural constitutional errors—are subject to harmless error analysis." *United States v. Miller*, 531 F.3d 340, 346 (6th Cir. 2008) (citation modified). A structural error, though, will automatically warrant a new trial, "despite the effect of the error on the trial's outcome." *See United States v. Simmons*, 797 F.3d 409, 413 (6th Cir. 2015) (citation modified). Here, no structural error occurred, so harmless-error review applies.

1.

Only a narrow set of trial errors "defy analysis by harmless-error standards." *Arizona v. Fulminante*, 499 U.S. 279, 309 (1991); *see also United States v. Kimbrel*, 532 F.3d 461, 469 (6th Cir. 2008). These so-called "structural errors" require "automatic reversal," *O'Neal v. Balcarcel*,

933 F.3d 618, 628 (6th Cir. 2019), because they "affect[] the framework within which the trial proceeds," *Fulminante*, 499 U.S. at 310, and "render[] a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence," *Recuenco*, 548 U.S. at 219 (quoting *Neder v. United States*, 527 U.S. 1, 9 (1999)). Put another way, structural errors undermine "certain basic, constitutional guarantees" such that they should never "be deemed harmless beyond a reasonable doubt." *Weaver v. Massachusetts*, 582 U.S. 286, 294-95 (2017); *see also Neder*, 527 U.S. at 7. In this way, structural errors are "exceptions to th[e] general rule" of harmless-error review. *United States v. Campbell*, 122 F.4th 624, 630 (6th Cir. 2024), *cert. denied*, No. 25-5179, 2025 WL 2824393 (U.S. Oct. 6, 2025). If an error is found to be structural, be it a *Remmer* error, *Bruton* error, or other error, harmless-error analysis does not apply. *See Weaver*, 582 U.S. at 299.

There are three independent reasons an error may be structural. *Id.* at 295. First, an error may be structural where "the right at issue is not designed to protect the defendant from erroneous conviction but instead protects some other interest," for example "the defendant's right to conduct his own defense." *Id.* Second, an error may be "structural if the effects of the error are simply too hard to measure," for example where "a defendant is denied the right to select his or her own attorney." *Id.* Third, an error may be "structural if the error always results in fundamental unfairness," for example where "an indigent defendant is denied an attorney." *Id.* at 296. However, "an error can count as structural even if the error does not lead to fundamental unfairness in every case." *Id.* (citation modified).

*Remmer* errors are not structural. *See Doan v. Brigano*, 237 F.3d 722, 736 (6th Cir. 2001), *overruled on other grounds by Wiggins v. Smith*, 539 U.S. 510 (2003). Under *Remmer*, a trial error occurs when an "unauthorized invasion[] on the jury proceedings," like an extraneous influence, affects "a defendant's Sixth Amendment right to a fair trial by a panel of impartial, indifferent jurors." *In re Sittenfeld*, 49 F.4th 1061, 1066 (6th Cir. 2022) (citation modified). "In this circuit, a *Remmer* hearing is required when a defendant presents a colorable claim that extraneous information or contact had an obvious or likely adverse effect on the jury." *Id.* (citation modified). A *Remmer* hearing requires the court to determine whether "improper

contact caused actual prejudice to the verdict," thereby "warrant[ing] a new trial." *Id.* at 1066-67 (citation modified).

Similarly, *Bruton* errors are not structural. *See Brown v. United States*, 411 U.S. 223, 231 (1973); *Harrington v. California*, 395 U.S. 250, 253-54 (1969). Under *Bruton*, a trial error occurs when "a defendant is deprived of his Sixth Amendment right of confrontation" because "the facially incriminating confession of a nontestifying codefendant is introduced at their joint trial." *Samia v. United States*, 599 U.S. 635, 647 (2023) (quoting *Richardson v. Marsh*, 481 U.S. 200, 207 (1987)). But "a nontestifying codefendant's statement does not violate the Confrontation Clause where it does not name the defendant, and implicates him *only* in light of other evidence presented at trial." *United States v. Alkufi*, 636 F. App'x 323, 335 (6th Cir. 2016). In any event, where a *Bruton* error occurs, a new trial is not automatic. Rather, courts examine the circumstances of the case to determine whether the error was harmless. *See Harrington*, 395 U.S. at 253-54.

Here, the jury inappropriately received unadmitted evidence containing a nontestifying codefendant's statement identifying another codefendant by name. This implicates both *Remmer* and *Bruton*. But we need not specifically decide which type of error occurred, because both *Remmer* and *Bruton* errors require harmless-error analysis. *Cf. United States v. Hendrickson*, 822 F.3d 812, 824 & n.5 (6th Cir. 2016) (applying the most stringent harmless-error standard without deciding whether a constitutional error occurred).

The defendants may be correct that the error here is distinct from the typical *Remmer* error in at least two ways: (1) the influence on the jury occurred with "the imprimatur of the Court," CA6 R. 40, Brockway Br., at 21-22, and (2) the error was discovered post-verdict, leaving no opportunity for a curative instruction. But the unique features of this case do not preclude us from analyzing the district court's error as a *Remmer* error. In fact, we have held that "it is the communication's potential to impact upon a juror's ability to perform his or her duties impartially, rather than the form or source of the communication, that dictates the necessity for conducting a *Remmer* hearing." *United States v. Walker*, 1 F.3d 423, 429 (6th Cir. 1993) (citation modified).

Moreover, the defendants' alternative suggestion that the error here was not a *Remmer* error because it was not extraneous to the court misunderstands *Remmer* jurisprudence. Although "the distinction between external and internal influences [can be] elusive," *Cunningham v. Shoop*, 23 F.4th 636, 684 (6th Cir. 2022) (Kethledge, J., concurring) (citation modified), "generally speaking, information is deemed extraneous if it derives from a source external to the jury," even if not external to the court, *see Warger v. Shauers*, 574 U.S. 40, 51 (2014) (citation modified). So, under Federal Rule of Evidence 606(b)(1), a juror may not disclose any jury-internal influences that "come[] from the jurors themselves," such as one juror "pressur[ing]" other jurors into a guilty verdict. *United States v. Bailey*, No. 19-2280, 2022 WL 2444930, at *9 (6th Cir. July 5, 2022) (quoting *United States v. Brooks*, 987 F.3d 593, 604 (6th Cir. 2021)). But a juror may disclose any jury-external influences, such as "when a juror's family member is threatened" or when "a bailiff tells the jurors that the defendant is wicked." *Bailey*, 2022 WL 2444930, at *9 (citation modified) (first citing *Tanner v. United States*, 483 U.S. 107, 123 (1987); then quoting *Parker v. Gladden*, 385 U.S. 363, 363 (1966)).

As the defendants here point out, *Remmer* errors often arise from court-external influences. *See, e.g.*, *Sittenfeld*, 49 F.4th at 1067 (juror posted and received comments on Facebook during deliberations); *Ewing v. Horton*, 914 F.3d 1027, 1029 (6th Cir. 2019) (jurors conducted internet research on the case); *United States v. Kechego*, 91 F.4th 845, 851 (6th Cir. 2024) (jurors used phones during deliberations). But the touchstone of a *Remmer* error is when jurors are exposed to an influence external to the jury, even if it is internal to the court.

2.

Here, the district court held, and defendants contend, that the court's error was structural because, under *Weaver*, the effects were too hard to measure. *See Weaver*, 582 U.S. at 295. Although we have not previously considered whether an error like this—jury exposure to unadmitted exhibits with no curative instruction—is structural, we find that it is not.

Again, very few errors meet *Weaver*'s too-hard-to-measure threshold for structural error. *See id.* at 299. The two primary examples of too-hard-to-measure structural errors are denial of choice of counsel and denial of a proper jury verdict. *See, e.g.*, *McCoy v. Louisiana*, 584 U.S.

414, 427 (2018); *Sullivan*, 508 U.S. at 281. The error here—erroneous jury exposure to unadmitted exhibits—fits neither of these too-hard-to-measure categories, and defendants cite no binding precedent holding otherwise. Instead, defendants propose that we should recognize a new type of too-hard-to-measure structural error.

But the error here is not too hard to measure. In fact, we frequently expect lower courts to measure the effects of *Bruton* and *Remmer* errors via harmless-error analysis. *See, e.g.*, *United States v. Lanier*, 870 F.3d 546, 551 (6th Cir. 2017) (ordering the district court to measure the prejudice of a juror's communication with an outside attorney via a *Remmer* hearing); *Cunningham*, 23 F.4th at 662 (ordering a district court to conduct a *Remmer* hearing to determine the effect of juror bias); *United States v. Olano*, 507 U.S. 725, 738 (1993) ("We generally have analyzed outside intrusions upon the jury for prejudicial impact."); *Harrington*, 395 U.S. at 254 ("[W]e conclude that this violation of *Bruton* was harmless beyond a reasonable doubt.").

For example, in *Nevers v. Killinger*, 169 F.3d 352 (6th Cir. 1999), *abrogated on other grounds by Harris v. Stovall*, 212 F.3d 940, 942-43 (6th Cir. 2000), we affirmed the district court's post-verdict harmless-error analysis where the jury received unadmitted negative news reports and rumors of the defendants' racial bias, with no curative instruction. *Id.* at 369-70. We held that these extraneous influences did not amount to structural error because the error did not "permeat[e] the entire process and thus was more closely akin to errors which occurred during the presentation of the case to the jury," which are typically "subject to harmless error review." *Id.* at 369. The same is true here. If a court can determine the harmfulness of unadmitted news reports and racial bias rumors, a court can determine the harmfulness of a few unredacted sentences,[4] even if those sentences were contained in what appeared to be legitimate exhibits.

Although the specific error in this case is unique among our cases, that alone is not sufficient to find structural error. Indeed, finding structural error each time we encountered a factually-unique trial error "would be inconsistent with our traditional categorical approach to

---

[4]We do not address the entirety of the district court's trial error (all ten unadmitted exhibits erroneously delivered to the jury and three admitted exhibits not delivered to the jury) because defendants only meaningfully argue that a portion of the error (exposure to Carey Exhibits 3 and 4) was structural or harmful.

structural errors." *Neder*, 527 U.S. at 14; *see also United States v. Blanton*, 719 F.2d 815, 822 (6th Cir. 1983) ("Every criminal trial is, of course, at least to some degree unique.").

The Ninth Circuit's decision in *United States v. Noushfar*, 78 F.3d 1442 (9th Cir. 1996), *amended*, 140 F.3d 1244 (9th Cir. 1998), cited by the defendants, does not alter this conclusion, because *Noushfar* is both nonbinding and distinguishable. The panel in *Noushfar* held that "[s]ending [fourteen] unplayed tapes to the jury room" over "vigorous objections" and with "no instructions" was structural error, because it represented a "complete abdication of judicial control over the process" that had immeasurable effect. *Id.* at 1445-46. Here, the court inadvertently presented the jury with unadmitted exhibits; this did not amount to judicial abdication of control. And the Ninth Circuit itself has cabined *Noushfar* to its facts. *See Eslaminia v. White*, 136 F.3d 1234, 1237 & n.1 (9th Cir. 1998) (declining to find structural error where the jury considered unadmitted taped comments and limiting *Noushfar* to its specific facts, including the large quantity and incriminating character of the extrinsic evidence in *Noushfar*).

Furthermore, the error in this case had a less pervasive effect than other structural errors. Again, only "a limited class of fundamental constitutional errors" that "infect the entire trial process and necessarily render a trial fundamentally unfair" rise to the threshold of structural error. *Neder*, 527 U.S. at 7-9 (citation modified). To illustrate, structural errors include: a judge's "unconstitutional failure to recuse," *United States v. Liggins*, 76 F.4th 500, 505 (6th Cir. 2023) (citation modified); "the presence of a biased juror," *Cunningham*, 23 F.4th at 660 n.9; denial of "the right to represent oneself," *Hendrickson*, 822 F.3d at 825; jury instructions which alter the government's burden of proof, *Doan v. Carter*, 548 F.3d 449, 455 (6th Cir. 2008); discriminatory jury selection practices under *Batson v. Kentucky*, 476 U.S. 79 (1986), *see Kimbrel*, 532 F.3d at 469; and "denial of a public trial," *Greer v. United States*, 593 U.S. 503, 513 (2021) (quoting *United States v. Davila*, 569 U.S. 597, 611 (2013)). Each of these errors "affect[s] the framework within which the trial proceeds," while the error here is "simply an error in the trial process itself." *Fulminante*, 499 U.S. at 310.

Lastly, we have declined to find structural error in similar cases of discrete trial error. For example, we have held that the physical absence of a defendant's attorney at a hearing is not "structural error unless the State was responsible for counsel's absence." *Clark v. Lindsey*, 936

F.3d 467, 470 (6th Cir. 2019).  Similarly, we found no structural error where a district court "fail[ed] to submit a sentencing factor to the jury," *Campbell*, 122 F.4th at 630 (citation modified), nor did we find structural error where the district court omitted an element of the charge, *United States v. Kuehne*, 547 F.3d 667, 681 (6th Cir. 2008).

In sum, the error in this case was not so unquantifiable as to be structural.  We therefore ask whether the error was harmless.

B.

Because the district court erroneously found structural error and offered no harmlessness determination, we perform a first-principles harmless-error analysis.  *See, e.g.*, *Hendrickson*, 822 F.3d at 824 (deciding harmlessness in the first instance); *United States v. Taylor*, 127 F.4th 1008, 1018 (6th Cir. 2025) (same).

1.

We first address the conflicting burden-of-proof standards for *Remmer* and *Bruton* errors in this circuit.  The "general rule" is that the government bears the burden to prove a constitutional error harmless "beyond a reasonable doubt."  *Campbell*, 122 F.4th at 630 (citation modified); *Chapman*, 386 U.S. at 24 ("[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.").  We follow that general burden-of-proof standard for *Bruton* errors, *United States v. Henderson*, 626 F.3d 326, 333 (6th Cir. 2010), but for *Remmer* errors we have held that the "defendant . . . carrie[s] the burden of proving actual prejudice," even though such errors are constitutional errors.  *Sittenfeld*, 49 F.4th at 1066-67; *see also United States v. Corrado*, 227 F.3d 528, 536 (6th Cir. 2000).  Ours is the "only circuit that places on the defendant the burden of proving bias at the *Remmer* hearing rather than requiring the Government to show . . . harmless[ness]."  *United States v. Lanier*, 988 F.3d 284, 295 (6th Cir. 2021) (citation modified).

But we need not decide definitively which standard should apply here, because we can "[a]ssum[e] without deciding that the most stringent standard for harmless-error review applies."

*Hendrickson*, 822 F.3d at 824 & n.5 (declining to decide which burden of proof applied "because any error was harmless even under the more demanding standard"). The error here was harmless under either standard.

2.

An error is harmless beyond a reasonable doubt where "the properly admitted evidence of guilt is so overwhelming" that "the prejudicial effect of the [error] is . . . insignificant by comparison." *United States v. Macias*, 387 F.3d 509, 520 (6th Cir. 2004) (citation modified). If "there is a reasonable possibility that the improperly admitted evidence contributed to the conviction," then the error is not harmless. *Id.* (citation modified). But if "the outcome would not have been different without the [error]," then the error is harmless. *Campbell*, 122 F.4th at 630 (citation modified); *see also Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986). Here, although the trial error is procedurally worrisome, the mild nature of the prejudice and the significance of the government's other evidence make this error harmless to each defendant.

a.

Of the three defendants, the error is most clearly harmless to Carey because the government presented significant other evidence of guilt and the error arguably helped, rather than prejudiced, him.

*Evidence of guilt.* At trial, the government played a recording of Carey discussing his own involvement in the crimes. In the recording, Carey also agreed to a second, fictional murder-for-hire. Additionally, several witnesses gave testimony directly implicating Carey in the murder-for-hire scheme. Finally, the government produced surveillance footage placing Carey at a victim's apartment prior to the murders.

*Prejudice of the error.* The jury's erroneous receipt of Carey Exhibits 3 and 4 directly supported Carey's defense theory that he lacked knowledge of the crimes. And, because the jury did not receive Peled's testimony regarding Carey's knowledge, this evidence supporting Carey's lack of knowledge went largely unrebutted. The court's error thus created the exact situation that Carey advocated for at trial: introduction of Carey Exhibits 3 and 4 without Peled's

testimony of Carey's knowledge.  Moreover, Carey may have even waived his objection to any *Bruton* error by voluntarily arguing for the admission of Brockway's facially identifying statement in Carey Exhibits 3 and 4.  *See Bailey v. Mitchell*, 271 F.3d 652, 657-58 (6th Cir. 2001) (noting that defendants may waive objections to Confrontation Clause violations).

Thus, the error was harmless to Carey.

b.

Because Carey Exhibits 3 and 4 do not directly inculpate Maund, and because the government presented significant other evidence of guilt, we find the error is also harmless to Maund.  But unlike Carey and Brockway, the jury convicted Maund of only murder-for-hire conspiracy, not kidnapping or kidnapping conspiracy, so we consider the impact of the error only on the single conviction.

*Evidence of guilt.*  At trial, the government played a recorded call between Maund and Peled in which Maund incriminated himself.  Peled also gave testimony, separate from his unadmitted testimony regarding Carey's knowledge, directly implicating Maund in the murder-for-hire scheme.  In addition, one of Maund's coworkers testified that, at Maund's request, the coworker contacted Peled so that Peled could help Maund handle Lanway's extortion attempts.  And the government introduced evidence, including bank records, showing that Maund transferred $150,000 to Peled on the afternoon of the murders.

*Prejudice of the error.*  The primary error here was the jury's improper receipt of a single Carey-exculpatory statement without receiving Peled's Carey-inculpating testimony.  This error relates to Maund's murder-for-hire conviction only tangentially, because Carey Exhibits 3 and 4 do not directly inculpate or exculpate Maund.  It is plausible that Carey Exhibits 3 and 4 mildly undermine one of Maund's affirmative theories of defense: that Carey committed the murders on his own, without Maund's input.  But the link between this theory of defense and Carey Exhibits 3 and 4 is tenuous at best.  And, because the error consisted of only one or two sentences, it is doubtful these sentences significantly diminished this theory of Maund's defense.

Maund also argues that he was further prejudiced because the *Remmer* hearing was constitutionally deficient under *United States v. Lanier*, 988 F.3d 284 (6th Cir. 2021), but we disagree. The mix-up regarding binder colors at the *Remmer* hearing did not deprive defendants of a constitutionally meaningful *Remmer* hearing. Because many of the jurors did not even remember the color of the binders, that the defendants questioned jurors specifically about a red binder does not rise to the *Lanier* level of "shackl[ing]" defendants' investigation into the external influence. *Id.*

Because the evidence against Maund was considerable, we conclude that the jury's verdict against Maund "would not have been different" absent the error, making it harmless. *Campbell*, 122 F.4th at 630 (citation modified).

c.

For Brockway, the significance of the government's evidence also overwhelms any possible prejudice from the error, making it harmless.

*Evidence of guilt.* At trial, the government introduced Government Exhibits 131 and 132, which captured Brockway discussing his involvement in the crimes and agreeing to another murder-for-hire scheme. Peled gave testimony directly implicating Brockway in the murder-for-hire scheme. The government also introduced evidence that Brockway was in Nashville during the murders, and left Nashville after the murders. And the government's evidence showed that, while in Nashville, Brockway rented a car that matched the vehicle captured on surveillance footage driving near where the victims' bodies were found.

*Prejudice of the error.* Of the three defendants, Brockway has the strongest claim of potential prejudice, because he was accused of physically kidnapping and murdering the victims in tandem with Carey. One of Brockway's primary theories of defense was that Carey committed the murders alone, without Brockway. And because the jury received Carey Exhibits 3 and 4, in which Brockway himself stated that Carey lacked certain knowledge of the crimes, these exhibits prejudiced Brockway by directly contradicting this pillar of his defense. But, considering the other overwhelming evidence of guilt, we find that this single statement, that "Adam [Carey] didn't know any of this shit" during a murder-for-hire scheme, RE 496-3, Carey

Ex. 4, PageID 5721, was "insignificant by comparison," *Macias*, 387 F.3d at 520 (citation modified).

Accordingly, we find the error harmless as to Brockway too.

### III.

The error here was neither structural nor harmful to any defendant. For the above reasons, we reverse the district court's grant of a new trial and remand for further proceedings.